50

Receipt Number
536992

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BASKIN-ROBBINS USA, CO., a
California corporation,

          Plaintiff,

vs.

JMM INVESTMENT, INC., a Michigan
corporation, and JOVICA M. MICIC,

          Defendants.

Exhibit A
Case: 2:06-cv-10261
Assigned To : Rosen, Gerald E
Referral Judge: Majzoub, Mona K
Assign. Date : 01/19/2006@ 1:48 P.M.
Description: CMP
BASKIN-ROBBINS USA, CO V.
JMM INVESTMENT INC., ET AL (TAM)

Elizabeth C. Jolliffe (P42712)
Clark Hill PLC
500 Woodward Avenue, Suite 3500
Detroit, Michigan 48226-3435
(313) 965-8300
Attorneys for Plaintiff

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff, Baskin-Robbins USA, Company, by its attorneys, Clark Hill PLC, alleges as follows:

### INTRODUCTION

1.    Plaintiff Baskin-Robbins USA, Co. ("Baskin-Robbins") is engaged in the business of franchising independent business persons to operate Baskin-Robbins shops throughout the United States. Baskin-Robbins franchisees are licensed to use trade names, service marks, and trademarks of Baskin-Robbins and to operate under the "Baskin-Robbins System," which involves the production, merchandising, and sale of ice cream and related products utilizing a specially designed building with special equipment, equipment layouts, interior and exterior

accessories, applications for use of products, management programs, standards, specifications, proprietary marks, and identification.

2.      Defendant JMM Investment, Inc. ("JMM") was a franchisee of Baskin-Robbins shops located at 35262 Dodge Park Road, Sterling Heights, Michigan 48312, pursuant to a Franchise Agreement (the "Franchise Agreement").

3.      Defendant Jovica M. Micic is the guarantor of JMM's obligations under the Franchise Agreement.

## THE PARTIES

4.      At all times mentioned herein, Baskin-Robbins was and is a foreign corporation duly organized and existing by virtue of the State of California and authorized to do business in the State of Michigan.

5.      Upon information and belief, at all times mentioned herein, JMM was and is a domestic corporation duly organized and existing by virtue of the laws of the State of Michigan whose principal place of business is in Macomb County, State of Michigan.

6.      Upon information and belief, at all times mentioned herein, Defendant Micic was and is a resident of, has a place of business in, and/or conducts business in Macomb County, State of Michigan.

7.      The Court has jurisdiction over this matter under 15 U.S.C. §1121.

8.      Venue is proper because the subject premises are located in Macomb County and because Defendant lives and/or conducts business in Macomb County, Michigan.

## PLAINTIFF'S TRADEMARKS, SERVICE MARKS, AND PROPRIETARY MARKS

9.      In connection with its business, Baskin-Robbins developed, uses, and controls the use of certain proprietary interests, trademarks, service marks, and trade names, including "Baskin-Robbins" which is registered on the Principal Register of the United States Patent Office and with the Michigan Department of Commerce.  The name "Baskin-Robbins" is used to publicly identify the source of goods and services marketed under that name and to represent to the public Baskin-Robbins' uniform standards of quality, cleanliness, appearance, and service.

10.     The distinctiveness of Baskin-Robbins' trademarks is an enormous asset of great worth to Baskin-Robbins in Michigan, the United States, and throughout the world.  These trademarks have come to symbolize the quality, goodwill, and fine reputation associated with and enjoyed by Baskin-Robbins on account of many years of consistent high quality, cleanliness, appearance, and service to the public.

11.     These registered marks remain in full force and effect, unrevoked and uncanceled.

### THE FRANCHISE AGREEMENT

12.     On or about November 14, 2001, Baskin-Robbins entered into a Franchise Agreement with JMM for a Baskin-Robbins franchise.  A copy is attached as Exhibit A.

13.     The Franchise Agreement authorized JMM to operate an ice cream shop, utilizing the Baskin-Robbins System, at 135262 Dodge Park Road, Sterling Heights, Michigan 48312 (the "Sterling Heights" shop).

14.     At the time the Franchise Agreement was signed, Defendant Micic executed a personal guarantee for the Franchise Agreement by which she unconditionally guaranteed to

Baskin-Robbins that JMM would fully and properly pay and discharge all its present and future

obligations to Baskin-Robbins. The guarantee is attached to the Franchise Agreement.

## THE PARTIES' RIGHTS AND OBLIGATIONS
## UNDER THE FRANCHISE AGREEMENT

15.    The Franchise Agreement executed by JMM contain acknowledgments and

agreements by JMM concerning the importance of maintaining Baskin-Robbins' standards for

uniformity, customer service, and product quality. The applicable paragraphs include, in part:

> Section 5.0.  FRANCHISEE understands and acknowledges the importance to FRANCHISOR, FRANCHISEE and other franchisees, of FRANCHISEE'S commitment to at all times operate the Unit in accordance with FRANCHISOR'S Standards (as defined in Definitions paragraph "I"), in order to increase the demand for FRANCHISOR'S products, to protect and enhance the reputation and goodwill of FRANCHISOR, to promote and protect the value of the Proprietary Marks and other reasons. FRANCHISEE agrees to devote continuous best efforts to successfully develop, manage and operate the Unit and to enhance the goodwill of the Proprietary Marks authorized by this Agreement and the System(s) as a whole.

> Section 5.1.1.  FRANCHISEE shall use all products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment, methods of exterior and interior design and construction and methods of product storage, handling, preparation, packaging, delivery and sale prescribed by FRANCHISOR.  All such items must conform to FRANCHISOR's Standards.  FRANCHISOR reserves the right to specify any item by brand.  FRANCHISEE shall carry out the business covered by this Agreement in accordance with the operational Standards established by FRANCHISOR and set forth in FRANCHISOR's operating manuals and other documents as they presently exist or shall exist in the future or as may be otherwise disclosed to franchisees from time to time.

> Section 7.0. FRANCHISOR has, in connection with its business and the business of its franchisees, developed and used and continues to use and control the usage of Proprietary Marks which are certain proprietary interests, trademarks, service marks, logos,

emblems, trade dress and other indicia of origin, including colors, and certain trade names, including but not limited to **Dunkin' Donuts®**, owned by Dunkin' Donuts Incorporated, **Baskin 31 Robbins®** owned by Baskin-Robbins Incorporated, and **TOGO'S®**, owned by Togo's Eateries, Inc., all of which are registered as trademarks on the Principal Register of the United States Patent and Trademark Office. FRANCHISEE's rights to use specific Proprietary Marks under this Agreement are set forth in the Special Terms and Conditions described in Item "J" of the Contract Data Schedule of this Agreement and attached hereto as a part hereof.

Section 7.1. FRANCHISEE agrees to use the Proprietary Marks only in the manner and to the extent specifically licensed by this Agreement. FRANCHISEE shall not sublicense the Proprietary Marks. FRANCHISEE further agrees that any unauthorized use of the Proprietary Marks during the term of or after expiration or the earlier termination of this Agreement shall constitute an incurable default causing irreparable harm subject to injunctive relief.

16. The Franchise Agreement contains acknowledgments and agreements by JMM concerning the effective breach of the agreement. For example, the applicable paragraphs include:

Section 9.0. FRANCHISEE shall be in default under this Agreement:

\* \* \*

Section 9.0.5. If FRANCHISEE fails to pay, perform, observe or comply with any of FRANCHISEE's duties and obligations under this Agreement; or if FRANCHISEE fails to carry out in all respects its obligation sunder any Lease, mortgage, equipment Agreement, promissory note, conditional sales contract or other contract materially affecting the Unit, to which the FRANCHISEE is a party or by which FRANCHISEE is bound, whether or not FRANCHISOR is a party thereto.

17. Under the terms of the Franchise Agreement, JMM agreed to do certain things, including the following:

       a.      To pay Baskin-Robbins a continuing weekly franchise fee of 5.9% of the gross sales of the Baskin-Robbins Shop (§4.3 and Item "E" of the Contract Data Schedule);

       b.      To pay a weekly contribution for advertising equal to 5% of the gross sales of the Baskin-Robbins Shop for the preceding week (§4.4 and Item "F" of the Contract Data Schedule);

       c.      To accurately report on an approved form each week gross sales for the 7 day period ending at the close of business on the preceding Saturday, at which time all fees required to be paid are to be remitted (§5.2.1);

       d.      To submit within 45 days after the close of each calendar or fiscal month, on an approved form, a profit and loss statement of the Baskin-Robbins Shop for the preceding calendar or fiscal month (§5.2.2); and

       e.      To pay interest at the rate specified on unpaid monies due (§9.3).

18.    The Franchise Agreement provides that the failure to pay fees or make advertising contributions constitutes a default under the agreement (§9.0.5).

19.    The Franchise Agreement provides for immediate termination of the franchise without further notice in the event a franchisee fails to cure a default or failure to pay monies when due and to provide proof of its cure to Baskin-Robbins within seven days after written notice of such defaults (§§9.1.1 and 9.4).

20.    The Franchise Agreement also contains acknowledgments and agreements by JMM concerning its obligations upon termination or expiration of the Franchise Agreements. Under §9.4.2, JMM agreed, among other things, to cease operating as a Baskin-Robbins franchisee and to discontinue use of Baskin-Robbins' trademarks, trade names, and proprietary marks after termination or expiration of the Franchise Agreement.

21.     In Section 8 of the Franchise Agreement, JMM agreed to certain restrictions on its

activities after termination, including:

> Section 8.0.    During the term of this Agreement, including any
> extension or renewal thereof, and for a period of two (2) years after
> expiration or termination of this Agreement, regardless of the
> cause of termination (hereinafter called the "Post-Term Period"),
> neither FRANCHISEE, nor any partner, officer, director,
> shareholder or member of FRANCHISEE, as the case may be
> shall:
>
> * * *
>
> Section 8.0.3. Except with respect to the ownership or operation of
> additional units under Franchises granted by FRANCHISOR, own,
> maintain, engage in, be employed by, or have any interest in any
> other business which sells or offers to sell the same or substantially
> similar products to the type FRANCHISOR requires to be offered
> by FRANCHISEE at the Unit; provided that, during the Post-Term
> Period only, the provisions of this paragraph 8.0.3 shall not apply
> to another business located more than five (5) miles from this or
> any other unit operating under the same Proprietary Marks of
> FRANCHISOR.  Either party to this Agreement, upon notice in
> writing to the other during the Post-Term Period, shall have the
> right to have determined whether said five (5) mile radius is a
> reasonable restriction on FRANCHISEE's activities, by requesting
> that the matter be submitted to arbitration in accordance with
> Section 11 of this Agreement.  In such event, the decision of the
> arbitrator shall be final and binding upon the parties.
> FRANCHISEE further agrees that, in the event arbitration is
> requested, FRANCHISEE will engage in no competitive activities
> pending resolution of the dispute.

22.     The Franchise Agreement further provides that in the event of termination for any

default, JMM shall pay to Baskin-Robbins all interest, damages, costs and expenses, including

attorney fees, incurred by Baskin-Robbins in enforcing its trademark rights or the Franchise

Agreement (§§9.3 and 9.4.1).

23.     Baskin-Robbins has duly performed all of the terms and conditions of the Franchise Agreement to be performed by it.

24.     On or about November 22, 2005, pursuant to the Franchise Agreement, Baskin-Robbins sent JMM a Notice of Default/Notice to Cure defaults in paying advertising and franchise fees and other fees.

25.     JMM did not cure its defaults under the Franchise Agreement.

26.     Therefore, on or about December 16, 2005, pursuant to the Franchise Agreement, Baskin-Robbins sent JMM a Notice of Termination, immediately terminating the Franchise Agreement.

27.     As of January 18, 2006, JMM owes approximately $9,750 for past-due franchise fees, advertising fees, late charges, other charges and legal fees for services through January 18, 2006, and these charges and fees continue to accrue.

28.     JMM has continued to operate the ice cream shop and has continued to use and sell products bearing Baskin-Robbins' proprietary marks in operating the shop.

## COUNT I
### Declaratory Judgment
### Injunctive Relief for Trademark Infringement and Breach of Noncompete Covenant

29.     Baskin-Robbins repeats and realleges each and every allegation of paragraphs 1 through 28 of this Complaint as if fully set forth herein.

30.     Baskin-Robbins has duly performed all the terms and conditions of the Franchise Agreement on its part to be performed.

31.     JMM continues to operate its business at the Sterling Heights shop as an ice cream shop.

32.     JMM did not immediately cease using the trademarks and name of Baskin-Robbins and did not comply with the other post-termination obligations under the Franchise Agreement upon termination of the Franchise Agreement.

33.     The continued use of the trademark and name of Baskin-Robbins by JMM is unauthorized and constitutes a fraud.  Such wrongful use of Baskin-Robbins' proprietary marks results in irreparable injury to Baskin-Robbins.  JMM acknowledged this fact in §7.1 of the Franchise Agreement.

34.     JMM's continued operation of the Sterling Heights shop as an ice cream shop is a violation of the noncompete covenant stated in Section 8 of the Franchise Agreement, and it has resulted in irreparable injury to Baskin-Robbins.    Further, under §9.6 of the Franchise Agreement, JMM consented to the issuance of an injunction prohibiting any conduct by JMM in violation of the noncompete covenant.

35.     Baskin-Robbins has no adequate remedy at law for JMM's wrongful use of Baskin-Robbins' proprietary marks and JMM's violation of the noncompete covenant.

36.     By reason of the foregoing, Baskin-Robbins is entitled to an order enjoining JMM, its employees, agents, servants, or persons acting on its behalf from using the trademark and name of Baskin-Robbins and from operating an ice cream shop at 35262 Dodge Park Road, Sterling Heights, Michigan 48312 or within a five-mile radius of that location or the locations of existing Baskin-Robbins shops.

## COUNT II
## Breach of the Franchise Agreements' Noncompete Covenants

37.     Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 36 of this Complaint as if fully set forth herein.

38.     In Section 8 of the Franchise Agreement, JMM agreed that during the term of the Franchise Agreement and for two years after expiration or termination of the Franchise Agreement, regardless of the cause of termination, neither it nor any of its shareholders would own, maintain, engage in, be employed by, or have any interest in any other business that sells or offers to sell the same or substantially similar products to the type offered by Baskin-Robbins shops, within five miles of the Baskin-Robbins shop identified in the Franchise Agreement or any other Baskin-Robbins shop.

39.     JMM's Franchise Agreement was terminated on December 16, 2005.

40.     Since December 16, 2005, JMM has continued to operate the Sterling Heights shop as an ice cream shop that sells the same or substantially similar products as it sold when it was a Baskin-Robbins franchisee.

41.     All of the restrictions of the noncompete covenants contained in the Franchise Agreement are reasonable as to duration, geographical area, and type of business restricted.

42.     JMM is operating the Sterling Heights shop in competition against Baskin-Robbins.

43.     JMM' s operation of the Sterling Heights shop has caused, is causing, and will continue to cause significant and foreseeable damages to Baskin-Robbins.

44.     JMM's actions constitute breaches of the Franchise Agreement it entered into with Baskin-Robbins.

45.     As a direct and proximate result of JMM's breaches, Baskin-Robbins has suffered damages that were reasonably foreseeable by JMM, including lost profits and attorney's fees.

## COUNT III
## Trademark Infringement

46.     Plaintiff repeats and realleges each and every allegation of paragraphs 1 through 45 of this Complaint as if fully set forth herein.

47.     JMM has actual knowledge that "Baskin-Robbins" is a registered trademark on the Principal Register of the United States Patent Office.

48.     Despite the termination of the Franchise Agreement, JMM has continued to operate the Sterling Heights shop as an ice cream shop while intentionally, deliberately, and willfully using the Baskin-Robbins' trademark and other proprietary marks in commerce at that location without Baskin-Robbins' consent and without a license.

49.     JMM has unfairly appropriated to itself, without Baskin-Robbins' consent, and in defiance and infringement thereof, the trademark and other proprietary marks of Baskin-Robbins along with the valuable goodwill created by, and on behalf of, Baskin-Robbins in connection with its name and proprietary marks.

50.     Many names, symbols, marks, processes, methods, systems, advertising information, and materials used by JMM in connection with the operation of the ice cream shop are identical with those used by Baskin-Robbins. Such use is intended to, and does, cause a likelihood of confusion or mistake, and deceives the public and purchasers as to the source of JMM's products and services.

51.     JMM is knowingly attempting to palm off on the public, to JMM's wrongful profit and advantage, imitations of Baskin-Robbins' licensed services, and JMM is thereby wrongfully attempting to confuse and deceive the public as to the sponsor of the services and to fabricate a connection of the services with Baskin-Robbins.

52.     JMM's acts are with the deliberate intent and desire to trade under Baskin-Robbins' name, symbol, proprietary marks, and the valuable goodwill attached and associated thereto.

53.     JMM's aforesaid acts have been and are willful, wanton, and otherwise intentional.

54.     Numerous customers and members of the general public who have previously purchased services advertised, distributed, and sold under license by franchisees of Baskin-Robbins are likely to be confused and misled in the purchase of JMM's unlicensed services, acts and representations.

55.     Other persons, firms, and corporations who are prospective customers of existing and future franchisees of Baskin-Robbins, and who have no knowledge of the authenticity of the symbol used by JMM, are also likely to be confused, misled, and deceived into believing that JMM's services are still sponsored by, or licensed, associated, or connected with Baskin-Robbins.

56.     JMM has ignored Baskin-Robbins' demands that JMM cease and desist operating the ice cream shop at 35262 Dodge Park Road, Sterling Heights, Michigan 48312 and from using Baskin-Robbins' proprietary marks.  JMM will continue to commit such acts unless restrained and enjoined by the Court.

57.     By reason of the foregoing, JMM has violated the provisions of 25 U.S.C. §1114, causing Baskin-Robbins foreseeable injury, including injuries for which Baskin-Robbins has no adequate remedy at law.

## COUNT IV
## Breach of Personal Guarantee

58.    Plaintiff repeats and realleges each and every allegation of Paragraphs 1 through 57 of this Complaint as if fully set forth herein.

59.    On November 14, 2001, Defendant Jovica Micic, as the sole shareholder of JMM, Inc. executed a personal guarantee in which she agreed that she would personally guarantee the full payment of JMM's money obligations under Section 4 of the Franchise Agreement and the performance of all of JMM's other obligations under the Franchise Agreement, including without limitation, Section 6 and Section 8.

60.    Because JMM has breached the Franchise Agreement by illegally using Baskin-Robbins' proprietary marks and by operating an ice cream shop in violation of the Franchise Agreement's noncompete provisions, Defendant Jovica Micic is liable, by virtue of her personal guarantees to Baskin-Robbins, for all damages inflicted on Baskin-Robbins by JMM's breaches of the Franchise Agreement.

61.    By reason of the foregoing, Baskin-Robbins is entitled to a judgment against Defendant Jovica Micic, for the damages inflicted by her and JMM's wrongful actions.

WHEREFORE, Baskin-Robbins respectfully requests that the Court:

(a)    enjoin JMM and all those acting in concert with it from infringing upon the Baskin-Robbins' trademarks and trade names and from otherwise engaging in unfair competition with Baskin-Robbins, by specifically enjoining JMM from using the trademark and name of Baskin-Robbins and from holding itself out to the public and operating as a Baskin-Robbins franchisee;

(b)    enter an injunctive order directing JMM to comply with the post-termination obligations under the Franchise Agreement and Lease, including but not limited to its noncompetition obligations under Section 8 of the Franchise Agreement;

(c)     enjoin JMM to file with the Court and serve on Baskin-Robbins within thirty days after the service upon JMM of the injunction, a report in writing under oath setting forth in detail the manner and form in which JMM has complied with the injunction;

(d)     enter a judgment in favor of Baskin-Robbins and against Defendants JMM and Jovica Micic for the damages incurred by Baskin-Robbins, including costs and attorney fees, as a result of JMM's breaches of the Franchise Agreement and the breach of the personal guarantee of Jovica Micic;

(e)     award Baskin-Robbins such other relief as this Court may deem just and proper.


Respectfully submitted,

CLARK HILL PLC


By: _____
Elizabeth C. Jolliffe (P42712)
500 Woodward Avenue, Suite 3500
Detroit, Michigan 48226-3435
(313) 965-8300
Attorneys for Plaintiff

Date: January 19, 2006



SDA #_____

PC # 360455

## FRANCHISE AGREEMENT
### ALLIED DOMECQ QUICK SERVICE RESTAURANTS

This Franchise Agreement is dated _November 14_, 2001, and made by and between **BASKIN-ROBBINS USA, CO.** (hereinafter "BASKIN-ROBBINS" or "FRANCHISOR"), a California corporation, all with principal offices in Randolph, Massachusetts and the following individual(s) and/or entity:

_____ **JMM INVESTMENT, INC.,** a Michigan corporation _____
(hereinafter individually or collectively referred to as "FRANCHISEE")

This Franchise Agreement includes the Contract Data Schedule, General Terms and Conditions designated as ("ADQSR110100") and the Special Terms and Conditions identified in Item "J" of the Contract Data Schedule below.

### CONTRACT DATA SCHEDULE

A.  Location of the Franchised Unit (the "Premises"):

| 35262 | Dodge Park | Sterling Heights | Michigan | 48312 |
|---|---|---|---|---|
| (number) | (street) | (city or town) | (state) | (zip code) |

B.  Term:  in the case of an existing Unit, until **November 30, 2007.**

C.  Initial Franchise Fee: _____ N/A _____ dollars ($        )

D.  Grand Opening Fee: _____ N/A _____ dollars ($        )

E.  Continuing Franchise Fee Rate: ----------FIVE POINT NINE-- percent (5.9%) of Gross Sales

F.  Minimum Continuing Advertising Fee Rate: ----------------FIVE-- percent ( 5.0%) of Gross Sales

G.  Refurbishment Date:  In the case of an existing unit, Not Applicable.
    Remodel Date:  In the case of an existing unit, Not Applicable.

H.  Transfer Fee:  As provided in subsection 10.4 of the General Terms and Conditions, unless another amount is inserted here: _____ NO CHANGE _____

I.  Address for notice to FRANCHISEE shall be at the Unit Premises, unless another address is inserted here: _____

J.  Special Terms and Conditions:

    [✓] Special Terms and Conditions Applicable to a Baskin-Robbins Franchise

    [✓] Provisions Applicable to a Single Brand Baskin-Robbins Unit

    [✓] Additional Terms and Conditions Applicable to the Baskin-Robbins Franchise Pursuant to the Baskin-Robbins Franchise Royalty Conversion Offer

K.  The Designated Representative for this Unit is _Joora Mirle_ _____
    [print full name above]

L.  Arbitration under this Agreement shall be initiated in the city and state of Chicago, IL.

M.  If applicable, the "Producing Unit" for this Dunkin' Donuts Unit is the Dunkin' Donuts manufacturing unit located at _____ N/A _____
    (insert address if this Unit is a Dunkin' Donuts non-producing unit; otherwise insert "not applicable").

Form last revised 10/02/99

Allied Domecq QSR corporations are EOE and AA Employers
(Franchisees are not employees)

# ALLIED-DOMECQ QUICK SERVICE RESTAURANTS
# FRANCHISE AGREEMENT

© November, 2000

## GENERAL TERMS AND CONDITIONS

### INTRODUCTION

Baskin-Robbins USA Co., a California corporation ("BASKIN-ROBBINS"), Dunkin' Donuts Incorporated, a Delaware corporation ("DUNKIN' DONUTS") and Togo's Eateries Inc., a California corporation ("TOGO'S") are indirect wholly-owned subsidiaries of Allied Domecq PLC, a publicly-traded United Kingdom company. To take advantage of synergies between them, the three subsidiaries share certain common field and support personnel and form an unincorporated division called "Allied Domecq Quick Service Restaurants". As a result of the expenditure of time, effort and money, each subsidiary has acquired experience and skill in the development and operation of food service establishments using distinctive systems and techniques for the production, distribution, merchandising and sale of branded food products, including, without limitation, *Baskin-Robbins®* ice cream, yogurt and novelties, *Dunkin' Donuts®* donuts, coffee and freshly baked goods, *Togo's®* fresh sandwiches, salads and deli platters, and other unique and distinctive products, services and business methods (hereinafter each called a "System" and collectively called the "Systems").

The distinguishing characteristics of these Systems include, without limitation, distinctive exterior and interior design, decor, color and identification schemes and furnishings; specially designed manufacturing and merchandising equipment; unique and proprietary information technologies and software; special menu items; standards, specifications and procedures for operations, manufacturing, distribution and delivery; quality of products and services offered; management programs; training and assistance; and marketing, advertising and promotional programs, all of which may be changed, supplemented, improved and further developed from time to time by FRANCHISOR as new learning and best practices are identified and incorporated.

### DEFINITIONS

As used throughout this Agreement, the following defined terms shall have the following meanings:

A.      The "Proprietary Marks" are certain proprietary interests, trademarks, service marks, logos, emblems, trade dress and other indicia of origin and trade names, which identify for the public the source of goods and services marketed thereunder and represent to the public high and uniform standards of quality, cleanliness, appearance and service, including, without limitation, *Dunkin' Donuts®* owned or controlled by DUNKIN' DONUTS, *Baskin 31 Robbins®* owned or controlled by Baskin-Robbins Incorporated ("BRI"), and *TOGO'S®* owned or controlled by TOGO'S, all of which are registered trademarks on the Principal Register of the United States Patent and Trademark Office.

B.      "FRANCHISOR" refers to Dunkin' Donuts Incorporated with respect to the Dunkin' Donuts System, Baskin-Robbins USA, Co., with respect to the Baskin-Robbins System and Togo's Eateries, Inc. with respect to the Togo's System.

C.      "FRANCHISEE" means the person(s) or entity who signed this Agreement, which may include a sole proprietor, all partners of a general partnership, a corporation or a limited liability company ("LLC"). No person or entity may claim an interest in this Agreement or any Franchise granted hereby without FRANCHISOR's prior written approval.

D.      The "Unit" means the branded food service establishment, including the fixtures, furnishings, equipment, inventory and supplies located therein and/or attached thereto, operated by FRANCHISEE pursuant to this Agreement. If this Agreement authorizes more than one brand, the term "Unit" shall refer to all branded operations authorized hereby, unless such reference is expressly limited to any one brand.

E.      The "Premises" means the land and building or the area within a building, as the case may be, which is (i) approved by FRANCHISOR, (ii) dedicated to the operation of the Unit, and (iii) in the exclusive possession and control of FRANCHISEE. Some portion of the Premises may be under shared possession or control, if approved by FRANCHISOR.

F.      The term "Lease" means the document by which FRANCHISEE occupies and controls the Premises, whether the landlord is a third-party or FRANCHISOR, or one of its subsidiaries or affiliates.

G.      "Gross Sales" means and includes all revenue from the sale of all products and services and all other income of every kind and nature related to the Unit, whether for cash, by redemption of gift certificates or for credit, regardless of collection; provided, however, "Gross Sales" does not include the incidental sales of gift certificates or newspapers, incidental receipts from pay telephones, or any sales taxes or other taxes FRANCHISEE collects from customers for transmittal to the appropriate taxing authority.

H.      The "Designated Representative" is the person from time to time designated by FRANCHISEE as being responsible for the day-to-day operation of the Unit. The Designated Representative must meet FRANCHISOR's then-current qualifications, including, without limitation, successful completion of FRANCHISOR's training, and must be authorized to act for and bind FRANCHISEE in all dealings with FRANCHISOR with respect to the day-to-day operation of the Unit. The initial Designated Representative is identified in Item "K" of the Contract Data Schedule of this Agreement.

-2-

I.       The "Standards" are requirements, specifications, criteria, guidelines, processes, techniques and standards which are from time to time established and revised by FRANCHISOR with respect to selection and development of the Premises, operation of the Unit and other aspects of each System. Examples of "Standards" are, without limitation, requirements and criteria for developing the Unit; specifications for the facility, equipment and products; business processes and techniques for the operation of the Unit; and guidelines and standards for quality, cleanliness, appearance and service.

## Section 1. Grant of the Franchise and Term

1.0       This Agreement grants to FRANCHISEE the right, subject to all of the terms and conditions hereinafter set forth, to operate a Unit solely at the Premises described in Item "A" of the Contract Data Schedule of this Agreement, including the right to use, solely in such Unit, the System or Systems and Proprietary Marks described in the Special Terms and Conditions attached to and made a part of this Agreement (the "Franchise"). The term of this Agreement shall begin on the date hereof and shall end on the date described in Item "B" of the Contract Data Schedule; provided however, the Franchise shall commence upon the occurrence, of all of the following conditions prior to the initial opening of the Unit or the transfer of the Unit, as the case may be:

1.0.1     **Training.** FRANCHISEE and its Designated Representative must successfully complete the then-current training program required by FRANCHISOR at one or more of FRANCHISOR's training centers located in Massachusetts, California or at other locations from time to time designated by FRANCHISOR. This requirement may be waived or modified by FRANCHISOR, in whole or in part, in its sole discretion, if FRANCHISEE or its Designated Representative has had comparable training or on-the-job experience.

1.0.2     **Financing.** Upon request by FRANCHISOR, FRANCHISEE must deliver evidence to FRANCHISOR that FRANCHISEE has obtained binding commitments for all financing needed to develop and/or operate the Unit.

1.0.3     **Documents.** FRANCHISEE must execute and deliver to FRANCHISOR all documents related to this Franchise customarily required, in then-current form, as provided by FRANCHISOR.

1.0.4     **Payment.** FRANCHISFE must, prior to opening or transferring the Unit (as the case may be) pay FRANCHISOR any and all moneys due, including, but not limited to, purchase price, fees, inventory, rent and/or security deposit, if required under the Lease.

1.0.5     **Possession.** FRANCHISEE must have the exclusive right to occupy and use the Premises for at least the term of this Agreement, whether FRANCHISEE owns the Premises, or leases the Premises pursuant to either (a) a Lease with a third party landlord on terms satisfying FRANCHISOR's then current lease policy and containing provisions required by FRANCHISOR; or (b) a Lease with FRANCHISOR or an affiliated entity.

1.0.6     **For a New Unit.** If this Unit is newly developed, FRANCHISEE must, prior to the Unit's initial opening, comply with all provisions of the Special Terms & Conditions attached to this Agreement relating to new unit development (Schedule "F/D" or "C/D", as applicable).

1.1       The term of this Agreement shall expire without notice upon any earlier expiration or termination of a Lease, foreclosure of a mortgage, or other event which has the effect of terminating FRANCHISEE's possession and occupancy of the Unit.

1.2       FRANCHISEE represents and warrants that FRANCHISEE and each individual partner, member and/or shareholder of FRANCHISEE, as the case may be, is a United States citizen or a lawful resident alien of the United States; that, where applicable, the FRANCHISEE entity (corporation or LLC) is and shall remain duly organized and in good standing during the term of this Agreement; and that all financial and other information which FRANCHISEE has provided to FRANCHISOR in connection with FRANCHISEE's application for this Franchise is true and accurate. FRANCHISEE's representations and warranties under this paragraph 1.2 are a material inducement to FRANCHISOR's grant of the Franchise to FRANCHISEE.

## Section 2. Services Furnished by FRANCHISOR

2.0       FRANCHISOR agrees:

2.1       **Prior to and For the Initial Opening of the Unit.**

2.1.1     FRANCHISOR shall make available to FRANCHISEE Standards for the design, construction, equipping and operation of the Unit; and

2.1.2     FRANCHISOR shall make available to two individuals designated by FRANCHISEE, one of whom must be a party to or guarantor of this Agreement FRANCHISOR's then current initial training program with respect to the operation of the Unit, at one or more of FRANCHISOR's Training Centers located in Massachusetts, California and/or at such other training facility as FRANCHISOR may, from time to time, designate; and

2.1.3     FRANCHISOR shall provide its current operating procedures to assist FRANCHISEE in complying with FRANCHISOR's Standards; and

2.1.4    FRANCHISOR shall make available to FRANCHISEE such assistance in the pre-opening, opening and initial operation of the Unit as FRANCHISOR shall deem advisable, based upon FRANCHISEE's organization, prior experience and training.

## 2.2    After the Initial Opening of the Unit.

2.2.1    FRANCHISOR shall maintain a continuing advisory relationship with FRANCHISEE, including consultation in the areas of marketing, merchandising and general business operations; and

2.2.2    FRANCHISOR shall provide FRANCHISEE with FRANCHISOR's Standards for the authorized System(s), as the same may be modified by FRANCHISOR from time to time, in its sole and absolute discretion; and

2.2.3    FRANCHISOR shall continue its efforts to maintain high and uniform standards of quality, cleanliness, appearance and service at all units; and

2.2.4    FRANCHISOR shall make reasonable efforts to disseminate FRANCHISOR's Standards to potential suppliers of products at the written request of FRANCHISEE, subject, however, to specific requirements and limitations of each authorized System.

## Section 3. Advertising and Promotion

3.0    FRANCHISOR has established and administers a marketing, advertising and sales promotion fund (the "Fund") for each of the Systems, and directs the development of all advertising, marketing and promotional programs for each System. FRANCHISEE's payments to the Fund(s) shall be used for advertising, marketing, promotion, production and development of all advertising, marketing, promotional and other programs, product development, merchandising, public relations, administrative expenses, programs designed to increase sales and enhance and further the public reputation of FRANCHISOR and each applicable System, and activities related to any and all of the foregoing. The content of all activities of the Fund(s), including, without limitation, the media selected and employed, as well as the area and units to be targeted for such activities, shall be at the sole discretion of FRANCHISOR. FRANCHISOR undertakes no obligation to make expenditures for FRANCHISEE which are equivalent or proportionate to contributions paid under this Agreement or to insure that FRANCHISEE benefits directly or on a prorata basis from activities of the Fund(s), if any. Upon request, FRANCHISOR will provide FRANCHISEE a statement of receipts and disbursements for any Fund to which FRANCHISEE contributes under the terms of this Agreement, prepared by an independent public accountant for each fiscal year of the Fund.

3.1    FRANCHISEE, prior to using any advertising or promotional material that FRANCHISEE has prepared for use in its local area, shall submit such material to FRANCHISOR for review and approval. If written disapproval of the advertising and promotional material is not received by FRANCHISEE from FRANCHISOR within fifteen (15) days from the date such material is received by FRANCHISOR, said materials shall be deemed approved for use by FRANCHISEE, unless and until subsequently disapproved by FRANCHISOR, in which event FRANCHISEE will promptly discontinue any further use thereof.

3.2    FRANCHISEE acknowledges that this Agreement grants FRANCHISEE no right to use any of the Proprietary Marks to advertise products and/or services (or order through the mail or by any electronic or other medium. FRANCHISEE shall not, without the prior written approval of FRANCHISOR, use any of the Proprietary Marks on the Internet or any similar electronic or other communications medium, to promote FRANCHISEE's business and/or advertise and/or sell products and/or services. Notwithstanding the provisions of paragraph 3.1 above, FRANCHISOR's failure to disapprove any request to use the Internet or any similar electronic or other medium within fifteen (15) days shall not give FRANCHISEE the right to undertake such use. FRANCHISOR shall have the sole right to establish an Internet "home page" using any of the Proprietary Marks, and to regulate the establishment and use of linked home pages by its franchisees.

3.3    Special Terms and Conditions for each System authorized for this Unit are attached to this Agreement and contain additional provisions related to advertising and promotion.

## Section 4.  Payments

4.0    FRANCHISEE shall pay to FRANCHISOR the following initial charges and continuing fees:

4.1.    Initial Franchise Fee. - FRANCHISEE shall pay FRANCHISOR an Initial Franchise Fee in the amount set forth in Item "C" of the Contract Data Schedule of this Agreement. Unless the Initial Franchise Fee was prepaid under the terms of a Store Development Agreement, five thousand dollars ($5,000.00) shall be paid upon the execution of this Agreement and the remaining unpaid balance within ten (10) days after FRANCHISEE's receipt of FRANCHISOR's written approval of the Premises; provided however, if the Premises is developed by FRANCHISOR, the balance shall be due in full upon FRANCHISEE's execution of the Lease of the Unit, or on the date FRANCHISEE or the Designated Representative commences FRANCHISOR's training program, whichever date is earlier.

4.2    Grand Opening Fee. - FRANCHISEE shall pay a Grand Opening Fee in the amount set forth in Item "D" of the Contract Data Schedule of this Agreement, for a grand opening promotional advertising program or such other advertising program as FRANCHISOR may specify. Payment shall be made in full prior to attendance by FRANCHISEE or the Designated Representative at FRANCHISOR's training program or thirty (30) days prior to the scheduled opening of the Unit, whichever date is earlier, and shall be nonrefundable after the Unit commences operations.

*General Terms and Conditions*

-4-

4.3     **Continuing Franchise Fees** - FRANCHISEE shall pay FRANCHISOR at Post Office Box 1097, Charlotte, North Carolina 28201-1097 (or to such other address as FRANCHISOR shall from time to time advise FRANCHISEE in writing), on or before Thursday of each week, a sum determined by multiplying the Gross Sales of the Unit for the seven (7) day period ending at the close of business on the preceding Saturday times the percentage set forth in Item "E" of the Contract Data Schedule of this Agreement.

4.4.    **Continuing Advertising Fee.** FRANCHISEE shall also pay, at the same time, for the same seven (7) day period, in the same manner as, and in addition to the payments provided for under paragraph 4.3 above, the percentage set forth in Item "F" of the Contract Data Schedule of this Agreement, of the Gross Sales of the Unit, to one or more Funds for advertising, marketing, promotion and other purposes, as specified in Section 3 of this Agreement.

4.4.1   In addition, FRANCHISEE shall participate in and make additional payments to the Fund(s) with respect to all advertising, marketing, promotion and other programs of each authorized brand at the Unit, which from time to time are supported by two-thirds of the units of such brand in the market in which the Unit is located with respect to local programs, and in the continental United States, with respect to national programs.

4.4.2   If FRANCHISEE is authorized to use more than one (1) System at the Unit, fees payable under this paragraph 4.4 with respect to each System shall apply only to that portion of the Unit's Gross Sales which are applicable to that System, as determined by FRANCHISOR.

4.5     If any sales, income, excise, use or privilege tax is imposed or levied by any government or governmental agency on account of the payment of franchise or royalty fees by FRANCHISEE under this Agreement, FRANCHISEE shall pay FRANCHISOR a sum equal to the amount of such tax as an additional royalty fee (but this provision shall not apply to federal or state income taxes imposed upon FRANCHISOR).

4.6     FRANCHISOR shall have the right to require FRANCHISEE, upon written notice, to make payments under this Agreement by electronic funds transfer or to a lock-box located at an independent bank. Acceptance of payment by electronic funds transfer or to a lock-box shall not be deemed a waiver of any rights of FRANCHISOR. If FRANCHISOR establishes a direct debit program with FRANCHISEE's bank for the electronic payment of continuing franchise and advertising or sales promotion fees, FRANCHISEE must provide FRANCHISOR with all consents, authorizations and bank account data necessary to effect such electronic payment.

4.6.1   FRANCHISEE must complete and deliver to FRANCHISOR such forms as may from time to time be required to effectuate any changes as necessary to maintain EFT capability. FRANCHISEE agrees (a) to give FRANCHISOR at least fourteen days written notice (except in the case of emergency) before making any change to FRANCHISEE's EFT bank account, providing all information and specimens required to change EFT to the new account; (b) to pay FRANCHISOR its then-current late fee, plus collection costs and reasonable attorney's fees, if FRANCHISEE'S bank rejects FRANCHISOR's EFT request because of insufficient funds; and (c) upon demand, to replace EFT rejected by FRANCHISEE's bank with a bank certified or cashier's check in the aggregate amount owed, plus interest, late fees, collection fees, costs of collection and attorneys fees.

4.6.2   For each week that FRANCHISEE (a) submits a weekly Gross Sales report via FRANCHISOR's approved electronic form over the Internet, and (b) pays the corresponding weekly continuing franchise and advertising fees by EFT, FRANCHISOR will deduct the fees from FRANCHISEE's bank account on or after the Thursday twelve (12) days after the Saturday of the week for which sales were reported. This benefit will only become available after FRANCHISOR implements an electronic form for reporting weekly sales satisfactory to FRANCHISOR. To have this benefit available, FRANCHISEE must have computer equipment capable of accessing and using the electronic form in the manner required. In FRANCHISOR's discretion or due to system failure, FRANCHISOR may elect to withdraw the electronic form. In any such case, FRANCHISEE must immediately return to reporting Gross Sales in the manner originally required.

4.7     **Late Fee, Interest and Costs.** If any payment required under this Agreement is not paid when due, FRANCHISEE shall pay, in addition to the unpaid amount, FRANCHISOR's then-current late fee for each unpaid invoice. In addition, all amounts payable by FRANCHISEE to FRANCHISOR under any provision of this Agreement, if not paid when the same becomes due, shall bear interest from the date due until paid at the rate of one and one-half percent (1.5%) per month, or the maximum rate permitted by law, whichever is less. Entitlement to such interest shall be in addition to any other remedies FRANCHISOR may have. Receipt of any check, draft or other commercial paper shall not constitute payment until all funds therefrom are collected by FRANCHISOR. FRANCHISEE shall pay all collection charges, including reasonable attorney's fees, on dishonored checks. At FRANCHISOR's request, dishonored and returned checks will be promptly replaced by FRANCHISEE by a bank certified or cashiers check in the aggregate amount owed, plus interest, late fees, collection fees, costs of collection and attorneys fees, set forth in this Agreement.

## Section 5. Covenants of FRANCHISEE

5.0     FRANCHISEE understands and acknowledges the importance to FRANCHISOR, FRANCHISEE and other franchisees, of FRANCHISEE's commitment to at all times operate the Unit in accordance with FRANCHISOR's Standards (as defined in Definitions paragraph "I"), in order to increase the demand for FRANCHISOR's products, to protect and enhance the reputation and goodwill of FRANCHISOR, to promote and protect the value of the Proprietary Marks and other reasons. FRANCHISEE agrees to devote continuous best efforts to successfully develop, manage and operate the Unit and to enhance the goodwill of the Proprietary Marks authorized by this Agreement and the System(s) as a whole.

5.0.1   If, in any consecutive twelve (12) month period, FRANCHISEE shall receive two (2) or more notices to cure any default under this Agreement, FRANCHISOR shall have the right, in addition to all other remedies available, to require that FRANCHISEE (in lieu of any Designated Representative) devote full time to managing the day-to-day operation of the Unit.

5.0.2    FRANCHISEE agrees to operate the Unit in strict accordance with all of FRANCHISOR's Standards as they may be communicated to FRANCHISEE from time to time. Standards shall be established for and distributed to franchisees generally and/or FRANCHISEE specifically, in such form and content as FRANCHISOR may from time to time in its sole discretion prescribe. Standards are copyrighted and FRANCHISEE shall not at any time copy, duplicate, record or otherwise reproduce any materials, in whole or in part, which set forth the standards or other proprietary information, or otherwise make the same available to any unauthorized person. FRANCHISEE shall at all times maintain the documents embodying the Standards at the Unit (or at FRANCHISEE's principal offices, if not the Unit) and shall ensure that such documents are kept current and up to date. In the event of a dispute as to the contents of the Standards, the terms of the master copy(s) maintained by FRANCHISOR shall control.

5.0.3    FRANCHISEE acknowledges that complete uniformity may not be possible or practical throughout the System(s) and agrees that FRANCHISOR may from time to time vary Standards, as FRANCHISOR may deem necessary or desirable for the System(s) or the Unit.

5.1    **Unit Operations.** - FRANCHISEE shall keep the Unit open and in continuous normal operation for such hours as FRANCHISOR shall from time to time direct, provided, however, no longer than the maximum number of hours per day permitted by law, on all days except Christmas and Thanksgiving, unless prior written approval is obtained from FRANCHISOR or unless FRANCHISOR otherwise directs in writing. In connection therewith, but without limitation, FRANCHISEE further agrees as follows:

5.1.1    FRANCHISEE shall use all products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment, methods of exterior and interior design and construction and methods of product storage, handling, preparation, packaging, delivery and sale prescribed by FRANCHISOR. All such items must conform to FRANCHISOR's Standards. FRANCHISOR reserves the right to specify any item by brand. FRANCHISEE shall carry out the business covered by this Agreement in accordance with the operational Standards established by FRANCHISOR and set forth in FRANCHISOR's operating manuals and other documents as they presently exist or shall exist in the future or as may be otherwise disclosed to franchisees from time to time.

5.1.2    FRANCHISEE shall refrain from using or selling any products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment and methods of product storage, handling, preparation, packaging, merchandising, and delivery, or any other items of any kind, which do not meet FRANCHISOR's Standards. Without limiting the generality of the foregoing, FRANCHISEE shall immediately rectify all hazardous situations, and immediately remove and destroy any and all hazardous products. For purposes of the foregoing sentence, "hazardous situations" are those which have the potential to cause injury, illness or death, and "hazardous products" are products which are unfit for human consumption or which have the potential to cause injury, illness or death.

5.1.3    FRANCHISEE shall offer for sale all products that FRANCHISOR may, from time to time in its sole discretion, designate in writing as approved for sale at the Unit. FRANCHISEE shall sell, distribute and deliver such products only in weights, sizes, forms and packages as are approved in writing by FRANCHISOR. FRANCHISEE further agrees to discontinue offering for sale any product that FRANCHISOR may, at any later time, in its sole discretion, by written notice withdraw approval for sale at the Unit; and FRANCHISEE agrees to refrain from offering for sale any product or products which have not been designated in writing as approved by FRANCHISOR for sale at the Unit. FRANCHISOR may disapprove FRANCHISEE's sale of any product(s) or FRANCHISEE's participation in any program(s), in the event FRANCHISEE fails to comply with operational Standards at the Unit. FRANCHISEE shall have sole and complete discretion as to the price FRANCHISEE charges for all products.

5.1.4    FRANCHISEE shall maintain at all times a sufficient supply of approved products to meet the demand of FRANCHISEE's customers at the Unit.

5.1.5    FRANCHISEE shall purchase all food products, supplies, equipment and materials required for the operation of the Unit from FRANCHISOR or from suppliers who (a) demonstrate, to the reasonable satisfaction of FRANCHISOR, the ability to meet all of FRANCHISOR's Standards for such items, (b) possess adequate capacity and facilities to supply the needs of FRANCHISEE and other franchisees in the quantities, at the times and with the reliability requisite to an efficient operation, and (c) have been approved, in writing, by FRANCHISOR. Prior to purchasing any items from any supplier not previously approved by FRANCHISOR, FRANCHISEE shall submit to FRANCHISOR a written request for approval of the supplier. FRANCHISOR may require that samples from the supplier be delivered to FRANCHISOR or to a designated independent testing laboratory for testing prior to approval and use. FRANCHISEE shall pay FRANCHISOR a fee not to exceed the actual cost of the test; provided, however, no fee shall be charged for the first test requested by FRANCHISEE in any calendar year. This paragraph is subject to Special Terms and Conditions which contain additional provisions and limitations specific to the System(s) authorized for the Unit by this Agreement.

5.1.6    FRANCHISEE shall maintain, at all times and at FRANCHISEE's expense, the interior and exterior of the Unit and all fixtures, furnishings, signs and equipment in the highest degree of cleanliness, orderliness, sanitation and repair, as reasonably required by FRANCHISOR. FRANCHISEE shall make no material alteration, addition, replacement or improvement in or to the interior or exterior of the Unit (including the parking lot and landscaped areas) without FRANCHISOR's prior written consent.

5.1.7    FRANCHISEE shall comply with all civil and criminal laws, ordinances, rules, regulations and orders of public authorities pertaining to the maintenance and operation of the Unit, including, but not limited to, those relating to health, safety, sanitation, employment, environmental regulation and taxation.

-5-

-6-

5.1.7.1  FRANCHISEE agrees to maintain as business records provided in subsection 5.2 below, and to furnish to FRANCHISOR within five (5) days after receipt of written demand therefor, copies of all customer complaints and notices, warnings, citations, inspection reports and other communications related to the Unit from public authorities. FRANCHISEE hereby authorizes any such public authority to provide FRANCHISOR with copies of such notices and/or communications.  If any suit, investigation or other legal proceeding related to FRANCHISEE's business should be commenced by or against FRANCHISEE, FRANCHISEE shall immediately notify FRANCHISOR thereof and keep FRANCHISOR continuously advised of the status of the matter.

5.1.8  FRANCHISEE shall manage the Unit at all times with at least two (2) individuals, one of whom must be FRANCHISEE, or a partner, shareholder or member of FRANCHISEE, either of whom must be the Designated Representative and both of whom must have successfully completed FRANCHISOR's training program. Both individuals must have literacy and fluency in the English language sufficient, in FRANCHISOR's opinion, to satisfactorily complete FRANCHISOR's training program and to communicate with employees, customers, and suppliers.  If FRANCHISEE operates more than one unit, FRANCHISOR requires that each additional unit be managed by a Designated Representative approved by FRANCHISOR.

5.1.8.1  In the event of any resignation, termination, disability, death or other incapacity of the Designated Representative, FRANCHISEE shall notify FRANCHISOR in writing of the name of a qualified successor Designated Representative as soon as possible, but in no event later than two (2) months after such event.

5.1.8.2  FRANCHISEE shall hire, train and supervise efficient, competent and courteous employees of good character for the operation of the Unit and shall ensure that all such employees are trained in accordance with FRANCHISOR's training procedures.  FRANCHISEE is solely responsible for hiring and discharging employees of the Unit, and for setting their wages and terms of employment.  FRANCHISEE shall ensure that all employees whose duties include customer service have sufficient literacy and fluency in the English language to adequately serve the public in the Unit.  FRANCHISEE (or the Designated Representative, as specified by FRANCHISOR) shall attend, and FRANCHISEE shall require employees at the Unit to attend, such further training as FRANCHISOR shall from time to time reasonably require.  The cost of training materials, salaries, accommodations and travel expenses, if any, of FRANCHISEE or any other individual employed in the Unit will be borne entirely by FRANCHISEE.  FRANCHISEE will bear the cost of all training programs except FRANCHISOR's initial training program referred to in paragraph 2.1.2 of this Agreement.

5.1.9  FRANCHISEE shall accurately report all Gross Sales to FRANCHISOR and implement all procedures recommended by FRANCHISOR to minimize employee theft.  FRANCHISEE further acknowledges and agrees that employee theft shall not relieve FRANCHISEE of the obligation to make all payments to FRANCHISOR based on Gross Sales pursuant to Section 4 of this Agreement and that accurate reporting of Gross Sales requires, among other things, compliance with all Standards related thereto and recording all sales at the time the product is delivered to the purchaser, including, without limitation, retail, wholesale and bulk discount sales, whether for cash, by redemption of gift certificates or coupons, or sales for which payment may be deferred.

5.2     **Books, Records and Reports.**  FRANCHISEE shall keep full, complete and accurate books and accounts with respect to the Unit, in accordance with generally accepted accounting principles and all requirements of law and in the form and manner prescribed below or as from time to time further prescribed by FRANCHISOR.  Commencing upon the opening of the Unit:

5.2.1   FRANCHISEE shall submit to FRANCHISOR, on or before Thursday of each week, on a standard form approved by FRANCHISOR, a signed statement of Gross Sales at the Unit for the seven (7) day period ending at the close of business on the preceding Saturday, along with all moneys required to be paid under Section 4 of this Agreement.

5.2.2   FRANCHISEE shall submit to FRANCHISOR, on a standard form approved by FRANCHISOR, within forty-five (45) after the close of each of FRANCHISEE's calendar or fiscal month, a profit and loss statement of the Unit for said monthly period.

5.2.3   FRANCHISEE shall submit to FRANCHISOR, on a standard form approved by FRANCHISOR, within forty five (45) days after the close of each applicable period, a profit and loss statement prepared in accordance with generally accepted accounting principles, along with a balance sheet (including a statement of retained earnings or partnership account) (i) for the first six (6) months of each of FRANCHISEE's fiscal year; and (ii) for the full twelve (12) months of each of FRANCHISEE's fiscal years. FRANCHISOR shall have the right, in its sole discretion, to require that such annual financial statements be certified by an independent certified public accountant or such other independent public accountant acceptable to FRANCHISOR.

5.2.4   FRANCHISEE shall submit to FRANCHISOR, at the times and in the form required, such other periodic reports and information as may from time to time be prescribed by FRANCHISOR.

5.2.5   FRANCHISEE shall preserve, in the English language and for the time periods set forth below, all books, tax returns, accounting records and supporting documents relating to the FRANCHISEE's business operations at the Unit (hereinafter called the "Records"), including but not limited to:
   a.  daily cash reports;
   b.  cash receipts journal and general ledger;
   c.  cash disbursements journal and weekly payroll register;
   d.  monthly bank statements, and daily deposit slips and canceled checks;
   e.  all business tax returns;
   f.  suppliers invoices (paid and unpaid);

g. dated cash register tapes (detailed and summary);
h. semi-annual balance sheets and monthly profit and loss statements;
i. weekly inventories;
j. records of promotion & coupon redemptions;
k. such other records and information as FRANCHISOR may from time to time request.

FRANCHISEE shall be permitted to preserve Records and submit reports electronically, in accordance with FRANCHISOR's Retail Information System ("RIS") and/or other requirements, or otherwise with the prior written approval of FRANCHISOR. During the term of this Agreement, FRANCHISEE shall preserve and make available to FRANCHISOR all Records for no less than the current fiscal year and the three (3) immediate-past fiscal years. For three (3) years after the date of any transfer of any interest in this Agreement, the transferor of such interest shall preserve and make available to FRANCHISOR all Records of its last three (3) fiscal years of operation under this Agreement. For a period of three (3) years after the expiration of the term of this Agreement (or after any earlier termination thereof) FRANCHISEE shall preserve and make available to FRANCHISOR all Records for the last three (3) fiscal years of FRANCHISEE's business operation at the Unit.

5.2.6    Retail Information System    FRANCHISEE shall record all sales at or from the Unit at the time of sale, in accordance with FRANCHISOR's procedures and on devices, the make, model and serial numbers of which have been individually approved in writing by FRANCHISOR. Such devices must record accumulated sales in a manner that cannot be turned back or reset, and must retain data in memory storage in the event of power loss. FRANCHISEE shall, at its sole cost and expense, upon notice from FRANCHISOR, purchase or lease and install a unit and/or network information technology system, including computers, printers, touch heads, cash drawers, software and other equipment designated by FRANCHISOR for the Unit (hereinafter for convenience called "RIS"). The term "RIS" includes, without limitation, all hardware and software designated from time to time by FRANCHISOR and the data stored thereon by FRANCHISEE. Some or all components of RIS may be licensed to FRANCHISOR and used by FRANCHISEE as a sub-licensee. FRANCHISEE shall use RIS solely in connection with the operation of the Unit, in the manner specified by FRANCHISOR from time to time. FRANCHISEE shall comply with such requirements determined by FRANCHISOR from time to time regarding maintenance, training, storage and safeguarding of data, records, reports and other matters relative to RIS.

5.2.6.1  FRANCHISEE shall, at its sole cost and expense: (a) attend, and/or cause the Designated Representative and/or employees in the Unit to attend, such initial and other RIS training as is specified by FRANCHISOR; (b) maintain RIS in continuous operation at the Unit; (c) purchase an ongoing maintenance and support contract from an approved supplier and replace the RIS components as necessary, (d) upgrade RIS from time to time as may be reasonably required by FRANCHISOR; (e) permit FRANCHISOR immediate access to RIS, electronically or otherwise, at all times without prior notice to FRANCHISEE (such access shall not unreasonably interfere with FRANCHISEE's normal Unit operations); and (f) install and maintain telephone or other service required by FRANCHISOR to permit such access.

5.2.6.2  FRANCHISEE shall, at its sole cost and expense, upon FRANCHISOR's request, replace RIS with the computers, printers, touch heads, cash drawers, software and other equipment designated by FRANCHISOR from time to time as FRANCHISOR's then-current unit and/or network information system. Such replacements shall take place when deemed advisable by FRANCHISOR given the age, cost to operate, condition of the information system then in the Unit, the then-current and anticipated technology, the information systems then in use at other Units, the needs of the System(s), and other factors as may be relevant.

5.2.6.3  FRANCHISOR makes no representation or warranty as to the costs, sales, or profits, if any, which may result from the installation and use of RIS and its replacements.

5.2.7    FRANCHISOR shall treat any Records received from FRANCHISEE pursuant to this subsection 5.2 as confidential, except that information may be released (a) to any person entitled to the same under any Lease; (b) in connection with any court order, legal proceeding or other dispute resolution process, whether instituted by FRANCHISOR or any other party; (c) to a prospective transferee of any interest subject to the provisions of Section 10 of this Agreement, and (d) as incorporated into anonymous general information disseminated to FRANCHISOR's franchisees and prospective franchisees, and in the formulation of plans and policies in the interest of the System(s).

5.3    **Insurance.**  FRANCHISEE shall procure, before the commencement of business, and maintain in full force and effect during the entire term of this Agreement, at FRANCHISEE's sole expense, an insurance policy or policies protecting FRANCHISEE and FRANCHISOR, and their directors and employees, against any loss, liability, including without limitation employment practices liability, or expense whatsoever from, without limitation, fire, personal injury, theft, death, property damage or otherwise, arising or occurring upon or in connection with FRANCHISEE's operation of the Unit or by reason of FRANCHISEE's occupancy of the Premises.

5.3.1    Such policy or policies shall include:

5.3.1.1  commercial general liability insurance, including but not limited to, product, contractual, and owned and non-owned vehicle liability coverages, with an aggregate single limit of two million dollars ($2,000,000.00) or such higher limit as FRANCHISOR, in its sole and absolute discretion, may from time to time require, and as may be required under the terms of any Lease or underlying lease for the Unit, for bodily injury and property damage combined; and

5.3.1.2  "All Risk" property damage insurance, including without limitation flood and earthquake protection, for the full replacement cost value of the Premises and all other property within or relating to the Unit, including signs, with no coinsurance clause and with a replacement cost clause attached; and

-7-

*General Terms and Conditions*

-8-

5.3.1.3   plate glass insurance and, if applicable, boiler insurance; and

5.3.1.4   employer's liability, worker's compensation and such statutory insurance as may be required in the state in which the Premises is located.

5.3.2   All insurance required under the terms of this Agreement (i) shall be written in the names of FRANCHISEE, FRANCHISOR and/or other party or parties designated by FRANCHISOR, as their respective interest may appear, by insurance companies reasonably acceptable to FRANCHISOR;   (ii) shall contain provisions denying to the insurer acquisition by subrogation of rights of recovery against any party named; (iii) shall provide that cancellation or alteration cannot be made without at least thirty (30) days written notice to any party named; and (iv) shall not be limited in any way by reason of any insurance which may be maintained by FRANCHISOR or any other party named.

5.3.3   During the term of this Agreement, FRANCHISEE shall promptly unless otherwise directed by FRANCHISOR, (but in no event later than ten (10) days after any such policy becomes effective or such payment is due) furnish FRANCHISOR with duplicate originals of all insurance policies, including renewal and replacement policies, together with evidence that all premiums have been paid.   If at any time FRANCHISEE fails to comply with the provisions of this subsection 5.3, FRANCHISOR, in addition to all other remedies available, shall have the right (but not the obligation) to obtain and/or maintain such insurance with respect to the Unit and/or Premises, at FRANCHISEE's sole expense. FRANCHISEE shall pay FRANCHISOR when and as billed for the cost of premiums therefor.   Maintenance of insurance and FRANCHISEE's performance of the obligations contained in this subsection 5.3 shall not relieve FRANCHISEE of liability under the indemnity provisions set forth in paragraph 5.4 below.

5.3.4.   Each of the parties hereby waives any and all rights of recovery against the other parties hereto, or against the officers, employees, agents, and representatives of such other parties, for damage to such waiving party or for loss of its property or the property of others under its control to the extent that such loss or damage is insured against under any insurance policy in force at the time of such loss or damage.   FRANCHISEE shall, upon obtaining the polices of insurance required hereunder, give notice to the insurance carrier or carriers that the foregoing mutual waiver of subrogation is contained in this Agreement.

5.4      **Indemnification.**   FRANCHISEE shall save, defend, exonerate, indemnify and hold harmless FRANCHISOR, and each of them, and the subsidiaries or each of them, and their respective officers, directors, employees, agents, successors and assigns, from and against (i) any and all claims based upon, arising out of, or in any way related to the operation or condition of any part of the Unit or the Premises, the conduct of business thereupon, the ownership or possession of real or personal property and any negligent act, misfeasance or nonfeasance by FRANCHISEE or any of its agents, contractors, servants, employees, or licensees, and including, without limitation, all obligations of FRANCHISEE incurred pursuant to any provisions of this Agreement, and (ii) any and all fees (including reasonable attorneys' fees), costs and other expenses incurred by or on behalf of FRANCHISOR in the investigation of or defense against any and all such claims.

5.5      **Refurbishment & Remodel of the Premises.**   FRANCHISEE shall timely complete future refurbishments and remodels of the Unit in accordance with this subsection 5.5.   Such refurbishments and remodels are in addition to FRANCHISEE's continuing obligations to maintain, repair and replace all equipment, signage, furnishing, decor and personal property related to the Unit in accordance with FRANCHISOR's standards.   FRANCHISEE's obligations to maintain, repair and replace shall not be delayed or deferred pending or in anticipation of any such refurbishment or remodel.

5.5.1   No later than the Refurbishment Date set forth in Item "G" of the Contract Data Schedule of this Agreement, and at the end of each ten (10) year period thereafter (if this Agreement is renewed), FRANCHISEE shall refurbish the Unit in accordance with FRANCHISOR's then-current refurbishment standards.   It is intended that the cost of the initial refurbishment shall not exceed $10,000.00 and that subsequent refurbishments shall not exceed $10,000.00 increased by the same percentage as the increase to the Consumer Price Index (all cities average) published by the U.S. Department of Labor for the period from the Refurbishment Date to the date of subsequent refurbishment.   The refurbishment required of the FRANCHISEE shall be generally the same as then required of units of the same age and condition.   The above refurbishing costs do not include costs for required maintenance and repair or costs to upgrade, change or replace the Retail Information System.

5.5.2   No later than the Remodel Date set forth in Item "G" of the Contract Data Schedule of this Agreement, and at the end of each ten (10) year period thereafter (if this Agreement is renewed), FRANCHISEE shall remodel the Unit in accordance with FRANCHISOR's then-current remodeling standards (including but not limited to fixtures, furnishings, signs and equipment).   The remodeling required of FRANCHISEE shall be generally the same as then required of units of the same age, condition, location and geographic region.

5.5.3   FRANCHISEE acknowledges and agrees that the requirements of this subsection 5.5 are both reasonable and necessary to ensure continued public acceptance and patronage of the System(s), to avoid deterioration or obsolescence of the Unit and to take advantage of changes and improvements in design, concept and decor.

5.6      **Cross-Guarantee.**   In the event FRANCHISEE, or any partner, member or shareholder of FRANCHISEE, now holds or hereafter acquires an interest in any other unit franchised by FRANCHISOR, FRANCHISEE shall be jointly and severally liable to FRANCHISOR as guarantor of the obligations of the franchisee under each franchise Agreement for such other unit(s).   Included in such guaranty are, without limitation, payment of all franchise fees, advertising fees, equipment payments, note payments, rental and other Lease payments to FRANCHISOR or any of its subsidiaries, if applicable, collection fees and general receivables now or hereafter due and payable to FRANCHISOR or guaranteed by FRANCHISOR to any third party.   FRANCHISEE's liability under this paragraph shall be limited to the extent that the

*General Terms and Conditions*

total sum due and payable by FRANCHISEE upon the account or debt of any other franchisee in default shall not exceed the total interest (as hereinafter defined) that the common shareholder(s), member(s) or partner(s), as the case may be, hold in FRANCHISEE. For this purpose, "interest" shall include without limitation, all equity in, assets, real estate interests of, loans or other financial interests of FRANCHISEE, held by or controlled by the common shareholder(s), member(s) or partner(s) or their immediate family, as the case may be. The terms of this paragraph shall not operate to extend any personal guaranty of any Lease obligations by any shareholder(s), member(s) or partner(s), after such guaranty shall have ended by its terms.

5.7     **FRANCHISEE Entity.** FRANCHISEE may be a sole proprietorship, a general partnership, a corporation or a limited liability company ("LLC"). FRANCHISEE may not be a limited partnership, trust or other entity not specifically authorized herein or approved by FRANCHISOR in writing.

5.7.1     **Corporation.** If FRANCHISEE is a corporation, (i) said corporation's charter shall provide that it is authorized to operate the Unit as provided under this Agreement; (ii) all shareholders of the corporation shall enter into a written Agreement, in a form satisfactory to FRANCHISOR, to jointly and severally guaranty the full payment and performance of the corporation's obligations to FRANCHISOR and to assume all personal obligations required of partners, members and/or shareholders contained in this Agreement; (iii) each stock certificate of the corporation shall have conspicuously endorsed upon it a statement that it is held subject to, and that further assignment or transfer thereof is subject to all restrictions imposed upon transfers by this Agreement; and (iv) no new shares of common or preferred voting stock in the corporation shall be issued to any person, persons, partnership, association, LLC or corporation without obtaining FRANCHISOR's prior written consent, pursuant to Section 10 of this Agreement. FRANCHISEE shall at all times maintain a current list of all owners of record and all beneficial owners of any class of voting stock of FRANCHISEE and shall furnish the list to FRANCHISOR upon request.

5.7.2     **LLC.** If FRANCHISEE is an LLC, (i) said LLC's operating agreement shall provide that its activities are limited to operating the Unit as provided under this Agreement; (ii) all members of the LLC shall enter into a written agreement, in a form satisfactory to FRANCHISOR, to jointly and severally guaranty the full payment and performance of the LLC's obligations to FRANCHISOR and to assume all personal obligations required of partners, members and/or shareholders contained in this Agreement; (iii) the LLC's operating agreement shall provide that any assignment or transfer of membership interests in the LLC is subject to all restrictions imposed upon transfers by this Agreement; and (iv) no new membership interest(s) in the LLC shall be created for, issued or granted to any person, persons, partnership, association LLC or corporation without obtaining FRANCHISOR's prior written consent, pursuant to Section 10 of this Agreement. FRANCHISEE shall at all times maintain a current list of all members of record of FRANCHISEE and shall furnish the list to FRANCHISOR upon request.

## Section 6.  Certain Rights of FRANCHISOR

6.0     In order to preserve the validity and integrity of the Proprietary Marks and to assure that the Standards of the System(s) are properly employed by FRANCHISEE in the operation of the Unit and, in general, to verify FRANCHISEE's compliance with the terms of this Agreement, FRANCHISOR, or its agents, shall have the right, at all times, with or without prior notice to FRANCHISEE, to enter and inspect any and all public or private area(s) of the Unit and to select materials, ingredients, products, supplies, paper goods, uniforms, fixtures, furnishings, signs and equipment for evaluation purposes to assure that these items conform to the Standards of the System(s). During the course of any such inspection, FRANCHISOR may photograph or videotape any part of the Unit, whether or not FRANCHISEE is present. FRANCHISOR may require FRANCHISEE to remove any item which does not conform to applicable Standards. FRANCHISOR may also, at FRANCHISEE's expense, remove or destroy any item which does not conform to applicable Standards.

6.1     If FRANCHISOR finds any condition on the Premises which FRANCHISOR deems to be hazardous, unsafe, unhealthy, unsanitary, unclean or in material disrepair, FRANCHISOR shall have the following rights in addition to all other rights set forth in this Agreement:

6.1.1     FRANCHISOR shall have the right to require FRANCHISEE to immediately close and suspend operation of the Unit, and/or to require such other actions as FRANCHISOR, in its sole discretion, deems necessary, whenever there is reason to believe that any products in the Unit are contaminated, or for other reasons of imminent risk to public health and safety. FRANCHISEE agrees to notify FRANCHISOR immediately of any suspected product contamination or other violation affecting public health or safety and to promptly take any action which FRANCHISOR requires in connection therewith. FRANCHISEE shall be solely responsible for all losses, costs or other expenses it incurs in complying with the provisions of this subsection 6.1; and/or

6.1.2     FRANCHISOR shall have the right to immediately remove or destroy, at FRANCHISEE's expense, any product which FRANCHISOR believes to be hazardous, contaminated or to otherwise pose an imminent risk to public health or safety; or

6.1.3     FRANCHISOR shall have the right to give FRANCHISEE twenty-four (24) hours written notice requiring the correction of an unsafe, unhealthy, unsanitary or unclean condition, or thirty (30) days written notice requiring maintenance, repairs or alterations to the Unit or correction of any other Standards violation. If FRANCHISEE has not within that time corrected the condition or completed the maintenance, repairs or alterations, as the case may be, FRANCHISOR may enter the Unit, without being guilty of, or liable for, trespass or tort, and may cause the condition to be corrected or the maintenance, repair, or alteration to be completed at the expense of FRANCHISEE and without prejudice to any other rights or remedies of FRANCHISOR.

-9-

*General Terms and Conditions*

-10-

6.2    In addition to FRANCHISOR's right to access information through the Retail Information System and otherwise, FRANCHISOR's representatives shall have the right to examine FRANCHISEE's original books, Records and supporting documents at reasonable times, and to perform, with or without notice to FRANCHISEE, such inspections, tests and other analyses as it deems appropriate to verify Gross Sales at the Unit.  If FRANCHISOR determines that the Gross Sales FRANCHISEE reported to FRANCHISOR are less than the Gross Sales ascertained by FRANCHISOR's analysis, FRANCHISEE shall immediately pay to FRANCHISOR all amounts owing to FRANCHISOR, the applicable Fund and FRANCHISOR's affiliated landlord corporation based upon the corrected Gross Sales.  If an analysis is undertaken due to (i) FRANCHISEE's failure to maintain the Retail Information System in continuous operation, or (ii) FRANCHISEE's failure to prepare, deliver or preserve statements or Records required by subsection 5.2 of this Agreement, or (iii) if any analysis of FRANCHISEE's books and Records results in the discovery of a discrepancy greater than three percent (3%) in the Gross Sales reported by FRANCHISEE, FRANCHISEE shall pay, in addition to the unpaid amounts owed FRANCHISOR, its affiliated landlord corporation and the applicable Fund, interest thereon from the date payment was due, at 18% per annum or the highest permissible rate.  FRANCHISEE shall also reimburse FRANCHISOR for all related expenses, including, but not limited to, reasonable investigation, accounting and legal fees and other reasonable expenses and costs such as travel, payroll and overhead expenses for FRANCHISOR's employees.  Such payments shall be without prejudice to any other remedies FRANCHISOR may have under this Agreement, including the right to terminate this Agreement, without opportunity to cure, in the case of intentional under-reporting of Gross Sales.

6.3    In the event that FRANCHISOR shall believe there may have been intentional under-reporting of Gross Sales for the Unit, FRANCHISEE (and all partners, members and shareholders of FRANCHISEE) shall, upon written demand from FRANCHISOR provide FRANCHISOR, in addition to Records described in paragraph 5.2.5, personal federal and state tax returns, bank statements (including deposit slips and canceled checks) and such other documents and information as FRANCHISOR may in its sole discretion request in connection with FRANCHISOR's efforts to verify Gross Sales reported to FRANCHISOR under this Agreement or any Lease of the Unit.  Information provided by FRANCHISEE under this paragraph 6.3 shall be subject to the confidentiality provisions of paragraph 5.2.7, except that exclusion (c) therein does not apply.  Schedules to personal tax returns and other financial data which are unrelated to the business of the Unit need not be provided by any partner, member or shareholder of FRANCHISEE who has not been active in the business, and, in addition, has not directly or indirectly owned or controlled at least a majority interest in the business at the Unit, alone or in conjunction with any other family member or related entity.

6.4    FRANCHISEE hereby grants FRANCHISOR the right to inspect the records of all suppliers, distributors, group purchasing programs, distribution centers, and other third parties supplying food products, supplies, equipment and materials to FRANCHISEE and hereby authorizes such parties to release records of FRANCHISEE's purchases and deliveries to FRANCHISOR, by electronic transfer or otherwise, at such times and places as FRANCHISOR shall request.

6.5    If, during the term of this Agreement or any extension or renewal thereof, FRANCHISEE directly or indirectly acquires ownership or control of the Premises, FRANCHISEE agrees to give FRANCHISOR prompt written notice of such ownership or control and to grant FRANCHISOR, under FRANCHISOR's standard Lease Option Agreement, the option to acquire a leasehold interest in the Premises in the event of default by FRANCHISEE under this Agreement or under any lease or mortgage relating to the Premises.  Said leasehold interest shall be for the remaining term of this Agreement, including any renewal, at "triple-net" fair market value rental for comparable properties and use in the area as mutually agreed by the parties, or, in the absence of agreement, as determined by arbitration.

## Section 7.  Proprietary Marks

7.0    FRANCHISOR has, in connection with its business and the business of its franchisees, developed and used and continues to use and control the usage of Proprietary Marks which are certain proprietary interests, trademarks, service marks, logos, emblems, trade dress and other indicia of origin, including colors, and certain trade names, including but not limited to **Dunkin' Donuts®**, owned by Dunkin' Donuts Incorporated, **Baskin 31 Robbins®**, owned by Baskin-Robbins Incorporated, and **TOGO'S®**, owned by Togo's Eateries, Inc., all of which are registered as trademarks on the Principal Register of the United States Patent and Trademark Office.  FRANCHISEE's rights to use specific Proprietary Marks under this Agreement are set forth in the Special Terms and Conditions described in Item "J" of the Contract Data Schedule of this Agreement and attached hereto as a part hereof.

7.1    FRANCHISEE agrees to use the Proprietary Marks only in the manner and to the extent specifically licensed by this Agreement.  FRANCHISEE shall not sublicense the Proprietary Marks.  FRANCHISEE further agrees that any unauthorized use of the Proprietary Marks during the term of or after expiration or the earlier termination of this Agreement shall constitute an incurable default causing irreparable harm subject to injunctive relief.

7.1.1    FRANCHISEE understands and acknowledges that FRANCHISEE's license to use any or all of the Proprietary Marks is non-exclusive and relates solely to the single location set forth in this Agreement.  FRANCHISEE further acknowledges that FRANCHISOR, in its sole discretion, has the right to operate or franchise other units and sales outlets and to grant other licenses in, and to, any or all of the Proprietary Marks, and to develop and establish other systems, products or services using the same or similar Proprietary Marks, or any other proprietary names and marks, and to grant licenses or franchises thereto, in each case at such locations and on such terms and conditions as FRANCHISOR deems acceptable, without providing any rights therein to FRANCHISEE.  FRANCHISEE further acknowledges the FRANCHISOR may license others to use the Proprietary Marks at locations and in ways that competes with FRANCHISEE and draws customers from the same area as the Unit.

7.2     FRANCHISEE agrees that, during the term of this Agreement and after the expiration or termination thereof, FRANCHISEE shall not directly or indirectly contest or aid in contesting the validity or ownership of the Proprietary Marks. FRANCHISEE shall not, directly or indirectly, apply to register, register or otherwise seek to use or control or in any way use any of the Proprietary Marks or any confusingly similar form or variation thereof in any place or jurisdiction outside the United States; nor shall FRANCHISEE assist any others to do so.

7.3     FRANCHISEE shall identify itself as the franchisee of the Unit in conjunction with any use of the Proprietary Marks, including, without limitation, uses on letterheads, invoices, order forms, receipts, and contracts. Upon the written request of FRANCHISOR, FRANCHISEE shall display a notice identifying the Unit as being independently owned and operated by FRANCHISEE, in such content and form and at such conspicuous locations on the Premises as FRANCHISOR may designate.

7.4     FRANCHISEE agrees to notify FRANCHISOR promptly of any litigation instituted by FRANCHISEE, or by any person, firm or corporation against FRANCHISEE, relating to the Proprietary Marks. In the event FRANCHISOR undertakes the defense or prosecution of any such litigation, FRANCHISEE agrees to execute any and all documents and do such acts and things as may, in the opinion of counsel for FRANCHISOR, be necessary to carry out such defense or prosecution.

### Section 8.   Restrictions on FRANCHISEE's Activities

8.0     During the term of this Agreement, including any extension or renewal thereof, and for a period of two (2) years after expiration or termination of this Agreement, regardless of the cause of termination (hereinafter called the "Post-Term Period"), neither FRANCHISEE, nor any partner, officer, director, shareholder or member of FRANCHISEE, as the case may be, shall:

8.0.1     Divert or attempt to divert any business or customer of the Unit to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with FRANCHISOR's Proprietary Marks and System(s);

8.0.2     Directly or indirectly contest or aid in contesting the right of FRANCHISOR or any prospective franchisee of FRANCHISOR to obtain a building permit, zoning variance or other governmental approval required for the development of another location as a unit franchised by FRANCHISOR.; or

8.0.3     Except with respect to the ownership or operation of additional units under Franchises granted by FRANCHISOR, own, maintain, engage in, be employed by, or have any interest in any other business which sells or offers to sell the same or substantially similar products to the type FRANCHISOR requires to be offered by FRANCHISEE at the Unit; provided that, during the Post-Term Period only, the provisions of this paragraph 8.0.3 shall not apply to another business located more than five (5) miles from this or any other unit operating under the same Proprietary Marks of FRANCHISOR. Either party to this Agreement, upon notice in writing to the other during the Post-Term Period, shall have the right to have determined whether said five (5) mile radius is a reasonable restriction on FRANCHISEE's activities, by requesting that the matter be submitted to arbitration in accordance with Section 11 of this Agreement. In such event, the decision of the arbitrator shall be final and binding upon the parties. FRANCHISEE further agrees that, in the event arbitration is requested, FRANCHISEE will engage in no competitive activities pending resolution of the dispute.

8.1     During the term of this Agreement, including any extension or renewal thereof, and for a period of two (2) years after expiration or termination of this Agreement, regardless of the cause of termination, neither FRANCHISEE, nor any partner, officer, director, shareholder or member of FRANCHISEE, as the case may be, shall communicate or divulge to, or use for the benefit of any person, persons, partnership, association or corporation, any information or knowledge concerning the methods of constructing, equipping or operating units under any of FRANCHISOR's Systems and all other information or knowledge which FRANCHISOR deems confidential and which may be communicated to FRANCHISEE, or of which FRANCHISEE may be apprised by virtue of FRANCHISEE's operation under the terms of this Agreement. FRANCHISEE shall divulge such confidential information only to such of its employees as must have access to it in order to operate the franchised business. Any and all information, knowledge, and know-how including, without limitation, drawings, materials, specifications, techniques, and other data, which FRANCHISOR designates confidential shall be deemed confidential for purposes of this Agreement. FRANCHISOR shall have the non-exclusive right to use and incorporate into FRANCHISOR's Systems, for the benefit of itself and other of FRANCHISOR's franchisees licensees and distributors, all modifications, changes, and improvements developed or discovered by FRANCHISEE or FRANCHISEE's employees or agents in connection with the franchised business, without any liability or obligation to the developer thereof.

8.2     The covenants contained in this Section 8 shall be construed as severable and independent and shall be interpreted and applied consistently with the requirements of reasonableness and equity. If all or any portion of a covenant in this Section 8 is held unreasonable or unenforceable by a court, arbitration panel or other agency having valid jurisdiction in a decision to which FRANCHISOR is a party, FRANCHISEE expressly agrees to be bound by any lesser covenant included within the terms of such greater covenant that imposes the maximum duty permitted by law, as if the lesser covenant were separately stated in, and made a part of, this Section 8.

8.3     FRANCHISEE acknowledges that FRANCHISOR shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Section 8, or of any portion or portions thereof, without FRANCHISEE's consent, and FRANCHISEE agrees to comply forthwith with any covenant as modified.

-11-

-12-

## Section 9. Default

9.0     FRANCHISEE shall be in default under this Agreement:

9.0.1    If FRANCHISEE shall become insolvent or make an assignment for the benefit of creditors, or if a petition in bankruptcy is filed by FRANCHISEE, or if such a petition is filed against and consented to by FRANCHISEE or is not dismissed within thirty (30) days, or if FRANCHISEE is adjudicated a bankrupt, or if a bill in equity or other proceeding for the appointment of a receiver of FRANCHISEE or other custodian for FRANCHISEE's business or assets is filed and is consented to by FRANCHISEE or is not dismissed within thirty (30) days, or if a receiver or other custodian is appointed, or if proceedings for composition with creditors under any state or federal law should be instituted by or against FRANCHISEE, or if the real or personal property of FRANCHISEE shall be sold at levy thereupon by any sheriff, marshall or constable, or

9.0.2    If FRANCHISEE is convicted of or pleads guilty or "nolo contendere" to a felony, a crime involving moral turpitude, or any other crime or offense that FRANCHISOR believes is injurious to the System(s), the Proprietary Marks or the goodwill associated therewith, or if FRANCHISOR has proof that FRANCHISEE has committed such a felony, crime or offense; or

9.0.3    If FRANCHISEE permits the use of the Unit or Premises for any illegal or unauthorized purpose, including, without limitation, palming off or substitution of products under the Proprietary Marks or other marks of FRANCHISOR; or

9.0.4    If any other franchise agreement between FRANCHISEE and FRANCHISOR or any affiliated entity is terminated by reason of FRANCHISEE's default thereunder; or

9.0.5    If FRANCHISEE fails to pay, perform, observe or comply with any of FRANCHISEE's duties and obligations under this Agreement; or if FRANCHISEE fails to carry out in all respects its obligations under any Lease, mortgage, equipment Agreement, promissory note, conditional sales contract or other contract materially affecting the Unit, to which the FRANCHISEE is a party to or by which FRANCHISEE is bound, whether or not FRANCHISOR is a party thereto.

9.1     **Thirty Day Cure Period.**  Except as otherwise provided in this Section 9, FRANCHISEE shall have the right to cure FRANCHISEE's default under this Agreement within thirty (30) days after written notice of default from FRANCHISOR is delivered pursuant to paragraph 14 hereof. Notwithstanding the foregoing, the following lesser periods shall apply under the circumstances described:

9.1.1    **Seven Day Cure Period.**  A seven (7) day cure period shall apply if FRANCHISEE fails, refuses, or neglects to pay when due to FRANCHISOR any moneys owing to FRANCHISOR or to any Fund, or if FRANCHISEE fails to maintain the insurance coverage set forth in subsection 5.3 of this Agreement.

9.1.2    **24 Hour Cure Period.**  A twenty-four (24) hour cure period shall apply as provided in paragraph 6.1.3 to the violation of any law, regulation, order or Standard of FRANCHISOR relating to health, sanitation or safety;  or if FRANCHISEE ceases to operate the Unit for a period of forty-eight (48) hours without the prior written consent of FRANCHISOR, provided, however, that if the Unit is abandoned, no cure period shall apply.

9.1.3    **Cure on Demand.**  FRANCHISEE shall cure on demand all "hazardous situations" and remove and destroy on demand all "hazardous products" as set forth in paragraph 5.1.2.1 and shall cure any situation which poses an imminent risk to public health and safety as provided in subsection 6.1.

9.1.4    **No Cure Period.**  No cure period shall be available if FRANCHISEE is in default under any paragraph designated 9.0.1 through 9.0.4 above; or if FRANCHISEE abandons the Unit; or if FRANCHISEE intentionally under-reports Gross sales, falsifies financial data or otherwise commits an act of fraud with respect to FRANCHISEE's acquisition of this Franchise or its rights or obligations under this Agreement; or if FRANCHISEE's Lease for the Unit is terminated due to FRANCHISEE's default thereunder.  In addition, no cure period shall be available for any default if FRANCHISEE has received three (3) or more previous notices-to-cure for the same or a substantially similar default (whether or not FRANCHISEE has cured the same), within the immediately preceding twelve (12) month period.

9.2     **Statutory Cure Period.**  If a statute in the state in which the Premises is located requires a cure period for the applicable default which is longer than any cure period specified in this Section 9, the statutory cure period shall apply.

9.3     **Late Fee, Interest and Costs.**  If FRANCHISEE fails to cure a default within any applicable time period following notice set forth in subsection 9.1, or if this Agreement is terminated as a result of FRANCHISEE's default, FRANCHISEE shall pay to FRANCHISOR all damages, costs and expenses, including, without limitation, late fees, collection fees, interest at one and one-half percent (1.5%) per month, or the highest permissible rate, and reasonable investigation and attorneys' fees incurred by FRANCHISOR as a result of any such default or termination.  All such interest, damages, costs and expenses may be included in and form part of the judgment awarded to FRANCHISOR in any proceedings brought by FRANCHISOR against FRANCHISEE.

9.4     **Termination.**  If FRANCHISEE fails to cure any default within the applicable period following notice from FRANCHISOR, FRANCHISOR may, in addition to all other remedies at law or in equity or as otherwise set forth in this Agreement, immediately terminate this Agreement.  Such termination shall be effective immediately upon receipt of a written notice of termination from FRANCHISOR.  Notwithstanding the foregoing, this Agreement shall immediately terminate upon the occurrence of any event set forth in paragraphs 9.0.1 through 9.0.4 or paragraph 9.1.4, without notice or opportunity to cure or notice of termination.  Upon any termination or expiration of this Agreement all right of FRANCHISEE to use the Proprietary Marks and the System(s) and to operate the Unit under the Proprietary Marks shall terminate and:

*General Terms and Conditions*

9.4.1   FRANCHISEE shall promptly pay FRANCHISOR all sums owing or accrued from FRANCHISEE to FRANCHISOR, the Fund, and any affiliated landlord entity, including interest and any damages, costs and expenses, including reasonable attorneys' fees, incurred by FRANCHISOR by reason of default on the part of FRANCHISEE; and

9.4.2   FRANCHISEE shall immediately cease to operate the Unit, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former FRANCHISEE of FRANCHISOR; and

9.4.3   FRANCHISEE shall immediately and permanently cease to use, by advertising or in any other manner whatsoever, any feature or method associated with the System(s), any or all of the Proprietary Marks and any other trade secrets, confidential information, operating manuals, slogans, trade dress, signs, symbols or devices which are part of FRANCHISOR's System(s) or are otherwise used in connection with the operation of the Unit. FRANCHISEE agrees that any such unauthorized use or continued use after the termination of this Agreement shall constitute irreparable harm. Continued use by FRANCHISEE of FRANCHISOR's trademarks, trade names, Proprietary Marks, and service marks after termination of this Agreement shall constitute willful trademark infringement by FRANCHISEE; and

9.4.4   FRANCHISEE shall immediately return to FRANCHISOR all operating manuals, plans, specifications, and other materials in FRANCHISEE's possession containing information prepared by FRANCHISOR and relative to the operation of the Unit, and all copies thereof (all of which are acknowledged to be FRANCHISOR's property), and shall retain no copy or record of any of the foregoing, except FRANCHISEE's copy of this Agreement, any correspondence between the parties, and any other documents which FRANCHISEE reasonably needs for compliance with any provision of law; and

9.4.5   FRANCHISEE shall remove from the Premises and from any equipment, signs, trade fixtures, furnishings and other personal property (except as provided in paragraph 9.4.6 below) and return to FRANCHISOR, all of the Proprietary Marks or other indicia of FRANCHISOR, and shall disconnect, withdraw and/or terminate, within five (5) days after termination or expiration of this Agreement, any telephone listings and/or fictitious name registration containing any part of the Proprietary Marks.  Upon FRANCHISOR's written demand, however, FRANCHISEE shall assign to FRANCHISOR, upon any termination, expiration or non-renewal of this Agreement, any telephone number used in the operation of the Unit if such number is listed in the directory using any of the Proprietary Marks.  FRANCHISEE hereby appoints FRANCHISOR as its attorney-in-fact, in the name of FRANCHISEE, to do any act necessary to effect the intent of this paragraph; and

9.4.6.   FRANCHISEE shall, but only in the case of any early termination of this Agreement due to FRANCHISEE's default, sell to FRANCHISOR, at FRANCHISOR's election, any or all of the equipment, interior and exterior signs, trade fixtures, furnishings and other personal property of FRANCHISEE used in connection with the Unit (hereinafter collectively "Equipment"), at the purchase cost when originally installed in the Unit, less a depreciation deduction computed on a straight line basis over a ten (10) year useful life for the respective items (but in no event less than ten percent (10%) of the original purchase cost for such equipment, fixtures and furnishings).  If FRANCHISEE owes a balance due on its purchase or financing of such Equipment, or if the same are otherwise subject to a lien or claim for any indebtedness, the amounts of such balance and/or indebtedness shall be deducted from the purchase price payable to FRANCHISEE.  All sums of money due FRANCHISOR by FRANCHISEE may be offset against the purchase price payable to FRANCHISEE.  Nothing contained herein, however, shall be construed to entitle FRANCHISEE to be released from liability for such unpaid balance or indebtedness, if any, in excess of the portion of the purchase price applied for payment of such debts; and

9.4.7   FRANCHISEE shall, at FRANCHISOR's option by notice to FRANCHISEE within thirty (30) days from the date of termination or expiration, assign to FRANCHISOR any interest which FRANCHISEE has in the Lease or any other Agreement related to the Premises.  If FRANCHISOR does not elect to exercise its option to acquire the Lease, FRANCHISEE shall make such modifications or alterations to the Premises immediately upon termination or expiration of this Agreement as may be necessary to distinguish the appearance of the Premises from that of other units in the System(s), and shall make such specific additional changes thereto as FRANCHISOR may reasonably require for that purpose.  In the event FRANCHISEE fails or refuses to comply with the requirements of this paragraph 9.4.7, FRANCHISOR shall have the right to enter upon the Premises, without being guilty of trespass or any other tort, for the purpose of making such changes as may be required, at the expense of FRANCHISEE, which expense FRANCHISEE agrees to pay upon demand; and

9.4.8   FRANCHISEE shall pay to FRANCHISOR all damages, costs and expenses, including, but not limited to, reasonable investigation and attorney's fees and other reasonable expenses and costs such as travel costs and payroll expenses for FRANCHISOR's employees, incurred in obtaining injunctive or other relief for the enforcement of any provisions of this Section 9; and

9.4.9   FRANCHISEE shall continue to comply with Section 8 of this Agreement, for the Post-Term Period specified therein.  If FRANCHISEE begins to operate any other business wherever situated, FRANCHISEE shall not use, in connection with such other business or the promotion thereof, any reproduction, counterfeit, copy or colorable imitation of any of FRANCHISOR's Proprietary Marks or trade dress;  and  FRANCHISEE shall not utilize any designation of origin or description or representation which falsely suggests or represent an association or connection with FRANCHISOR whether or not constituting unfair competition.

9.5     Nothing in this Agreement shall preclude FRANCHISOR from seeking any remedy under federal or state law for willful trademark infringement, including, without limitation, injunctive relief.  No right or remedy herein conferred upon or reserved to FRANCHISOR is exclusive of any other right or remedy herein, or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy given hereunder.  FRANCHISEE agrees that the existence of any claims against FRANCHISOR, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by FRANCHISOR of any provision of this Agreement.

-13-

*General Terms and Conditions*

-14-

9.6     Because the Unit is one of many units within the System(s) that sell similar products and services to the public, FRANCHISEE agrees that its failure to comply with the terms of this Agreement would cause irreparable damage to FRANCHISOR and the System(s) as a whole for which no adequate remedy at law may be available, including, without limitation, violations of standards, unhealthy, unsafe or unsanitary conditions, unauthorized use of the Proprietary Marks and breaches under Section 8 hereof. In the event of FRANCHISEE's breach or threatened breach of any of the terms of this Agreement, FRANCHISOR shall therefore be forthwith entitled to an injunction restraining such breach and/or to a decree of specific performance, without showing or proving any actual damage or irreparable harm or lack of an adequate remedy at law, and without the requirement for the posting of bond, the same being hereby waived by FRANCHISEE, until a final determination is made by a court of competent jurisdiction. The foregoing remedy shall be in addition to all other remedies or rights which FRANCHISOR might otherwise have by virtue of any breach of this Agreement by FRANCHISEE.

## Section 10.  Transfer Provisions

10.0    **Transfer By FRANCHISOR.**  This Agreement shall inure to the benefit of the successors and assigns of FRANCHISOR either individually or collectively. FRANCHISOR shall each have the right to assign its rights under this Agreement to any person, persons, partnership, association or corporation, provided that the transferee agrees in writing to assume all obligations undertaken by FRANCHISOR herein and FRANCHISEE receives a statement from both FRANCHISOR and its transferee to that effect. Upon such assignment and assumption, FRANCHISOR shall be under no further obligation hereunder except for accrued liabilities if any.

10.0.1    If this Agreement now or hereafter grants FRANCHISEE rights with respect to more than one (1) brand, FRANCHISOR shall have the right, at any time and from time to time, to require FRANCHISEE to execute and deliver separate contracts for each brand, each containing all of the terms of this Agreement pertaining to such brand. FRANCHISEE agrees to execute and return such replacement contracts to FRANCHISOR within thirty (30) days after receipt thereof. If FRANCHISEE fails to do so, FRANCHISOR shall have the right to execute such instruments on FRANCHISEE's behalf and deliver a copy thereof to FRANCHISEE.

10.1    **Transfer By FRANCHISEE.**  FRANCHISEE understands and acknowledges that the rights and duties set forth in this Agreement are personal to FRANCHISEE and that FRANCHISOR has granted the Franchise in reliance on the business skill and experience, financial capacity and personal character of FRANCHISEE. Except as hereinafter provided, neither FRANCHISEE, nor any partner, if FRANCHISEE is a partnership, nor any member, if FRANCHISEE is a limited liability company ("LLC"), nor any shareholder, if FRANCHISEE is a corporation, without FRANCHISOR's prior written consent, shall, by operation of law or otherwise, sell, assign, transfer, convey, give away, pledge, mortgage or otherwise encumber to any person, persons, partnership, association, LLC or corporation, any interest in this Agreement, or any interest in the franchise granted hereby, or any interest in any proprietorship, partnership, LLC or corporation which owns any interest in the franchise, nor offer, permit or suffer the same. Any purported assignment or transfer not having the prior written consent of FRANCHISOR shall be null and void and shall constitute default hereunder. Any proposed transfer must meet all the requirements of FRANCHISOR including, but not limited to, those set forth in this Section 10.

10.2    **Consent By FRANCHISOR.**  FRANCHISEE shall not unreasonably withhold its consent to any transfer referred to in paragraph 10.1 above, provided that:

10.2.1    FRANCHISEE must have operated the Unit for a period of not less than six (6) months prior to the proposed transfer;

10.2.2    The sales price of the interest to be conveyed must not be so high, or the terms of sale so onerous, that, in the judgment of FRANCHISOR, the transferee will be unlikely to properly maintain, operate and promote the Unit and meet the transferee's financial and other obligations to FRANCHISOR, third party suppliers and creditors. This provision shall not create any liability to either transferor or transferee on the part of FRANCHISOR, in the event that FRANCHISOR approves the transfer and the transferee experiences financial difficulties;

10.2.3    The transferee and each partner, shareholder or member of the transferee, as the case may be, must be a United States citizen or lawful resident alien of the United States, must be of good moral character and reputation and must have a good credit rating and business qualifications and aptitude reasonably acceptable to FRANCHISOR. Such qualifications include, without limitation, literacy and fluency in the English language sufficient, in FRANCHISOR's opinion, to communicate with employees, customers, and suppliers of FRANCHISOR and to satisfactorily complete FRANCHISOR's required training program and such other tests and interviews as FRANCHISOR shall reasonably deem to be necessary or desirable. FRANCHISEE shall provide FRANCHISOR with such information as FRANCHISOR may require to make a determination concerning each proposed transferee; and

10.2.4    The transferee may not be a limited partnership, trust or other entity not specifically authorized herein.

10.3    **Transfer Requirements.**  Each transfer of any interest in FRANCHISEE, the Unit, this Agreement and/or the Franchise herein granted, must receive the prior written consent of FRANCHISOR set forth in subsection 10.2 above and must conform to and/or comply with the following requirements:

10.3.1    Prior to the transfer, FRANCHISEE must pay and satisfy all accrued money obligations to FRANCHISOR, its affiliates and/or subsidiaries and to any Fund, obligations of FRANCHISEE which FRANCHISOR has guaranteed, liens, deferred rent and other obligations under the Lease for the Unit or other contracts pertaining to the Unit and the transfer fee provided below, as applicable;

*General Terms and Conditions*

10.3.2  Prior to the transfer, the Unit, including equipment, signs, building, improvements, interior and exterior, must be in good operating condition and repair and in compliance with FRANCHISOR's then-current Standards, including, without limitation, Standards for replacements and additions;

10.3.3  FRANCHISEE and any transferor may not assert any security interest, lien, claim or right now or hereafter in this Franchise, the Franchise granted to the transferee, or, if applicable, the Lease for the Unit with FRANCHISOR or its affiliated landlord entity.  Any security interest, lien, claim or right asserted with respect to any personal property at the above location shall not include any after-acquired property and shall be subject, junior and subordinate to any security interest, lien, claim or right now or hereafter asserted by FRANCHISOR, its successors or assigns;

10.3.4  Prior to the transfer, the transferee must comply with the requirements of paragraph 5.1.8 of this Agreement, to the satisfaction of FRANCHISOR;

10.3.5  If the transferee is a corporation or LLC, it must comply with the terms of subsection 5.7 of this Agreement;

10.3.6  The transferee, including, where appropriate, all shareholders, members and partners of the transferee, shall jointly and severally execute, on FRANCHISOR's then-current forms, a franchise agreement and all other standard ancillary agreements, including, without limitation, a priority in payment agreement, if applicable.  The priority in payment agreement provides, among other things, that if the transferee is unable at any time to make payments both to the transferor for the purchase of the Unit and to FRANCHISOR, its affiliates and/or subsidiaries and the Fund(s), payments to FRANCHISOR, its affiliates and/or subsidiaries and the Fund(s) will have priority.  The transferee's franchise agreement shall not increase any fee based upon a percentage(s) of Gross Sales to a percentage greater than as required by this Agreement for the respective System(s).  Unless a longer period is agreed upon between FRANCHISOR and the transferee, the term of the transferee's franchise agreement shall be for the unexpired term of this Agreement.  The transferee shall pay no franchise fee pursuant to paragraph 4.1 of this Agreement unless a longer term is agreed upon by FRANCHISOR;

10.3.7  FRANCHISEE, including all individuals proposing to transfer an interest in the Franchise or the FRANCHISEE, must execute, on FRANCHISOR's standard form, a general release of all claims against the FRANCHISOR corporations, their affiliated corporations, and the directors, officers and employees of each; and

10.3.8  In addition, FRANCHISOR shall have the right to promulgate and enforce such additional reasonable requirements as it may, in its sole judgment determine.

10.4     **Transfer Fee.**  The transferor shall pay to FRANCHISOR upon any transfer of any interest of FRANCHISEE in this Agreement or of any interest in the FRANCHISEE entity, a Transfer Fee determined as follows:

10.4.1  **Prior to FRANCHISEE's Fourth Year of Operations.**  The transferor shall pay to FRANCHISOR a Transfer Fee which is the greater of:  (i) five thousand dollars ($5,000.00), increased by five percent (5%) compounded annually during the term FRANCHISEE has operated the Unit under this or other agreements with FRANCHISOR;  or (ii) five percent (5%) of the Adjusted Sales Price of the Unit.

10.4.1.1  The term "Adjusted Sales Price" shall mean the sales price to be received by FRANCHISEE upon transfer of the Unit, less the amount, if any, paid by FRANCHISEE for the Unit, when purchased as an ongoing business from another franchisee or from FRANCHISOR.  No adjustment shall be made for amounts paid in connection with the development of a new unit.  The Adjusted Sales Price shall include, without limitation, cash, assumption of debt, equipment lease obligations and deferred financing and amounts allocated to property of every kind, nature and description:  furniture, fixtures, signs, equipment, supplies and inventory; excluding only amounts reasonably allocated to land and building, if owned by FRANCHISEE.  It is intended that all consideration to be paid to FRANCHISEE, or for the benefit of FRANCHISEE, however designated and whether or not included in the contract of sale shall be deemed part of the Adjusted Sales Price including, but not by way of limitation, amounts allocated to a covenant not to compete or personal service agreement.

10.4.1.2  For purposes of determining the correct Transfer Fee, FRANCHISOR reserves the right to reallocate amounts which FRANCHISEE and the transferee have allocated to land, building, equipment, covenant against competition, personal service agreement, or otherwise, if in FRANCHISOR's opinion, the allocation of the parties is unreasonable in relation to the value of the business.  If FRANCHISOR purchases the Unit from FRANCHISEE by exercise of its right of first refusal under paragraph 10.7, hereof, the Transfer Fee shall be payable by FRANCHISEE to FRANCHISOR as if FRANCHISEE had sold the franchised business to a third party.

10.4.2  **From and After FRANCHISEE's Fourth Year of Operations.**  If the transfer takes place after the commencement of FRANCHISEE's fourth year of operations, the transferor shall pay to FRANCHISOR the Transfer Fee indicated below based on the Unit's Gross Sales for the most recently completed twelve (12) calendar month period preceding the date of the contract of sale.  FRANCHISOR reserves the right to select another period or to make appropriate adjustments to such Gross Sales in the event extraordinary occurrences (e.g., road construction, fire or other casualty, etc.) materially affected Unit sales during the indicated twelve (12) month period.

| Sales for Most Recent 12 Month Period | Transfer Fee |
|---|---|
| Less than $400,000.00 | $5,000.00 |
| $400,000.00 or more, but less than $600,000.00 | $6,000.00 |
| $600,000.00 or more, but less than $1,000,000.00 | $8,000.00 |
| $1,000,000.00 or more, but less than $1,400,000.00 | $12,000.00 |
| $1,400,000.00 or more | $20,000.00 |

-15-

-16-

10.4.3  If FRANCHISOR purchases the Unit from FRANCHISEE by exercise of its right of first refusal under paragraph 10.7, hereof, the Transfer Fee shall be payable by FRANCHISEE to FRANCHISOR as if FRANCHISEE had sold the franchised business to a third party.

10.4.4  **Transfer of Less Than Control.**  For any transfer that, either alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, will have the result of the transferee(s) holding an aggregate interest of less than fifty percent (50%) of the franchise licensed herein or the entity licensed hereunder, FRANCHISOR will reduce the Transfer Fee set forth in paragraph 10.4.1 or 10.4.2, as applicable, to a fixed transfer documentation fee of five hundred dollars ($500.00), increased after each five (5) years of the term of this Agreement, including any renewal period, by the same percentage as the Consumer Price Index (all cities average) published by the U.S. Department of Labor for the same period.  FRANCHISOR will waive the Transfer Fee entirely with respect to a transfer of less than control, if each transferee was an approved party to (or personal guarantor of) this Agreement prior to transfer.

10.4.5  **Transfer to Spouse or Children.**  Notwithstanding anything else contained in this subsection 10.4, but provided that FRANCHISOR determines that FRANCHISEE has been in full compliance with the terms of all agreements with FRANCHISOR and its affiliates, the Transfer Fee due in connection with a transfer of the Unit to FRANCHISEE's spouse or one or more of FRANCHISEE's children shall be the fixed transfer documentation fee described in paragraph 10.4.4 above.  The franchise agreement issued to the spouse and/or children will be on the then-current form in use at the time of transfer including the then-current Transfer Fee provisions.

10.5  **Release of Transferor.**  Upon FRANCHISOR's approval of the transfer and FRANCHISEE's compliance with the aforesaid conditions, the transferor shall, provided that the transferor no longer has an interest in the Franchise, thereupon be relieved of further obligations under the terms of this Agreement, except that the transferor shall remain obligated for FRANCHISEE's money obligations under Section 4 through the date of transfer, and under the covenants contained in Section 8 for the Post Term Period therein described, after the date of transfer.

10.6  **Transfer on Death, Disability or Incapacity.**  In the event of the death, disability or mental incapacity of FRANCHISEE, or any partner, member or shareholder of FRANCHISEE, at any time during the term of this Agreement, the legal representative of the deceased, disabled or incapacitated party, as the case may be, together with all surviving partners, members or shareholders of FRANCHISEE, if any, shall, within six (6) months of such death, disability or mental incapacity, jointly apply, in writing to transfer the Franchise or the interest of the affected party in such Franchise, to such person or persons as the legal representative may specify.  Such transfer shall be approved by FRANCHISOR upon fulfillment of all of the conditions set forth in Section 10 of this Agreement.  A Transfer Fee shall be due pursuant to subsection 10.4 above, except that paragraph 10.4.5 shall apply if the transferee is a beneficiary or heir of FRANCHISEE.

10.6.1  If the legal representative and all surviving partners, members or shareholders, if any, do not propose a transferee acceptable to FRANCHISOR under the standards set forth in this Agreement within the period set forth in paragraph 10.6 above, or if no transfer of the interest shall have been accomplished consistent with the provisions of this Section 10 within one (1) year from the date of death, disability or mental incapacity, all rights licensed to FRANCHISEE under this Agreement shall terminate forthwith and automatically revert to FRANCHISOR.  FRANCHISOR shall have the right and option, exercisable under such termination, to purchase all furniture, fixtures, signs, equipment and other chattels at a price to be agreed upon by the parties or, if no agreement as to price is reached by the parties, at such price as may be determined by a qualified appraiser, approved by both parties, such approval not to be unreasonably withheld.  FRANCHISOR shall give notice of its intent to exercise said option no later than twenty-one (21) days prior to termination.

10.6.2  If the deceased, disabled or incapacitated party is the Designated Representative, then during the interim period until a transfer of the interest under this subsection 10.6 has taken place, the legal representative and surviving partners, members or shareholders shall operate the Unit through a successor Designated Representative who shall possess such qualifications for interim management of the Unit as FRANCHISOR may determine, in its discretion, from time to time.  Failure of FRANCHISEE or the legal representative to appoint a Designated Representative so qualified within ninety (90) days after the date of death, disability or mental incapacity of the Designated Representative shall be grounds for FRANCHISOR to terminate this Agreement after sending FRANCHISEE a thirty (30) day written notice-to-cure.

10.6.3  FRANCHISOR shall have the right to require a certified copy of an order of a court of competent jurisdiction over the estate of the deceased or incapacitated person, in which the legal representative or heir or legatee shall be determined, and may rely on such certified copy for the purposes of subsection 10.6.  If not furnished with such certified copy of a court order, or in the event of a legal contest, FRANCHISOR may decline, without liability, to recognize the claim of a party to such interest.  FRANCHISOR shall not be liable to any heir, next of kin, devisee, legatee, or legal representatives of a deceased or incapacitated person by reason of approval of a transfer of the interest to the surviving spouse or a child of the deceased, provided such approval is not contrary to an order of a court of competent jurisdiction served on FRANCHISOR.

10.7  **Right of First Refusal.**  If FRANCHISEE, or any shareholder, member or partner thereof, has received and desires to accept a signed, bona fide written offer from a third party to purchase FRANCHISEE's rights under this Agreement or any shareholder's, member's or partner's interest in the franchised business, FRANCHISEE or such shareholder, member or partner shall notify FRANCHISOR and provide it with a complete copy of such offer.  FRANCHISOR shall have the right and option, exercisable within forty-five (45) days after its receipt of said copy, to purchase FRANCHISEE's Franchise, or such shareholder's, member's or partner's interest in the franchised business, on the same terms and conditions as offered by said third party.  FRANCHISOR's exercise of its rights hereunder shall not relieve FRANCHISEE of its Transfer Fee obligation to FRANCHISOR.  Should FRANCHISOR not exercise this option and the terms of the unaccepted offer be altered, FRANCHISOR shall, in each such instance, be notified of the changed offer and shall again have forty-five (45) days to exercise its right to purchase on the altered terms.  Should FRANCHISOR not exercise this option, all of the terms of Section 10 shall apply to the transfer.

## Section 11.  Arbitration.

11.0    Except as otherwise specified in this Section 11, all controversies, claims or disputes between FRANCHISEE and FRANCHISOR of whatever kind or nature, whether arising out of or relating to the negotiation, performance or breach of this or any other agreement or otherwise, must be settled by arbitration administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules, as herein modified.  This provision encompasses all causes of action, whether nominally a "claim", "counterclaim" or "cross-claim", and whether arising under common law or any state or federal statute.  As used in this Section 11, the terms "FRANCHISOR" and "FRANCHISEE" include, without limitation, the past and present employees, agents, representatives, officers, directors, shareholders, members, guarantors, sureties, parent corporations, subsidiary corporations, controlled affiliated entities, predecessors, successors and/or assigns of each party hereto.  The parties intend that this provision be given the broadest possible interpretation by a court of law.

11.1    **Eligibility and Procedures.**  Arbitration must be initiated within the lesser of the time periods (a) set forth in paragraph 11.7.5 below or (b) permitted under the applicable statute of limitations for the cause of action asserted.  Any claim, controversy or dispute which is not so initiated within said lesser period shall not be eligible for arbitration under any circumstances.  Arbitration shall be initiated as provided in the Rules of the AAA by the filing of a demand for arbitration with the regional office of the AAA located in the city and state inserted in Item "L" of the Contract Data Schedule of this agreement.  If no location is inserted in Item "L" or if such insertion is incomplete or inaccurate, Boston, Massachusetts, shall be deemed to apply.  The arbitration proceedings, including without limitation all conferences, preliminary and dispositive hearings shall be conducted in such city and state unless all parties agree to another venue.  Actions to enforce an express obligation to pay moneys may be brought under the Expedited Procedures of the AAA's Commercial Arbitration Rules, provided there are no counterclaims.  The arbitrator(s) may issue such orders for interim relief as may be deemed necessary to safeguard the rights of the parties during the arbitration, but without prejudice to the ultimate rights of the parties, to the final determination of the dispute or to the rights of the FRANCHISOR to seek equitable relief from a court of competent jurisdiction at any time, even during the pendency of any arbitration proceedings initiated hereunder.

11.2    **Enforceability and Effect.**  Judgment on the award, including, without limitation, any interim award for interim relief, rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.  The binding or preclusive effect of any award shall be limited to the actual dispute or claim arbitrated, and to the parties, and will have no collateral effect on any other dispute or claim of any kind whatsoever.

11.3    **Governing Law.**  The Federal Arbitration Act and related federal judicial procedure shall govern this contract to the fullest extent possible, excluding all state arbitration law, irrespective of the location of the arbitration proceedings, the nature of the dispute between the parties or the nature of the court in which any related judicial proceedings may be brought.  Except as provided in the preceding sentence respecting arbitration law, the resolution of all disputes between the parties bound hereunder, whether in tort and regardless of the place of injury or the place of the alleged wrongdoing or whether arising out of or relating to the parties' contractual relationship, shall be governed by the law of the Commonwealth of Massachusetts without regard to choice of law principles.

11.4    **Exceptions to Arbitration.**  Disputes concerning the validity or scope of this Section 11 (arbitration), including, without limitation, whether a dispute is arbitrable hereunder, shall be beyond the authority of the arbitrator(s) and shall be determined by a court of competent jurisdiction pursuant to the Federal Arbitration Act, 9 U.S.C. §1 et seq., as amended from time to time.  In addition, the causes of action specified in the following subsections 11.5 and 11.6 are the sole and exclusive exceptions to the agreement of the parties hereto to resolve disputes through arbitration:

11.5    **FRANCHISOR's Exceptions.**  FRANCHISOR shall have the option to litigate any one or more of the causes of action specified in this subsection 11.5 and shall exercise said option by filing a complaint in any court of competent jurisdiction:

11.5.1    the enforcement of an obligation to pay money to FRANCHISOR under an express term of any agreement;

11.5.2    any action based upon an allegation of intentional underreporting of Gross Sales by FRANCHISEE;

11.5.3    any action for declaratory or equitable relief, including, without limitation, seeking of preliminary and/or permanent injunctive relief, specific performance, other relief in the nature of equity or any action at law for damage to FRANCHISOR's property or property interests or in equity to enjoin any harm or threat of harm to FRANCHISOR's goodwill, Proprietary Marks or its tangible or other intangible property, brought at any time, including, without limitation, prior to or during the pendency of any arbitration proceedings initiated hereunder;

11.5.4    any action seeking to terminate this Agreement based upon FRANCHISEE's material breach of paragraph 5.1.7 of this Agreement (excluding subparagraph 5.1.7.1); or

11.5.5    any action in ejectment or for possession of any interest in real or personal property.

11.6    **FRANCHISEE's Exceptions.**  FRANCHISEE shall have the option to litigate any cause of action otherwise eligible for arbitration hereunder and shall exercise said option solely by filing a complaint in any court of competent jurisdiction in which FRANCHISEE expressly waives the right to a trial by jury and any and all claim(s) for punitive, multiple and/or exemplary damages.  If any such complaint fails to include such express waivers or if any such court of competent jurisdiction determines that all or any part of such waivers shall be ineffective or void for any reason whatsoever, then the parties agree that the action shall thereupon be dismissed without prejudice, leaving the parties to their arbitration remedies, if then available pursuant to this Section 11.

-17-

-18-

11.6.1  In the event FRANCHISOR litigates any cause of action pursuant to subsection 11.5 above, FRANCHISEE shall not file any counterclaim, cross-claim, offset claim or the like against FRANCHISOR in the litigation, unless FRANCHISEE expressly waives the right to a trial by jury and any and all claim(s) for punitive, multiple and/or exemplary damages. Otherwise, FRANCHISEE shall submit each such counterclaim, cross-claim, offset claim or the like to arbitration, if then available pursuant to this Section 11.

11.7    **Waiver of Rights.**  THE PARTIES HERETO AND EACH OF THEM KNOWINGLY, VOLUNTARILY AND INTENTIONALLY AGREE AS FOLLOWS:

11.7.1  The parties hereto and each of them EXPRESSLY WAIVE(S) THE RIGHT ANY MAY HAVE TO A TRIAL BY JURY; and

11.7.2.   The parties hereto and each of them EXPRESSLY WAIVE(S) ANY CLAIM FOR PUNITIVE, MULTIPLE AND/OR EXEMPLARY DAMAGES, except that FRANCHISOR shall be free at any time hereunder to bring an action for willful trademark infringement and, if successful, to receive an award of multiple damages as provided by law; and

11.7.3   The parties hereto and each of them EXPRESSLY AGREE(S) THAT NO PARTY BOUND HEREBY MAY RECOVER DAMAGES FOR ECONOMIC LOSS ATTRIBUTABLE TO NEGLIGENT ACTS OR OMISSIONS EXCEPT FOR CONDUCT WHICH IS DETERMINED TO CONSTITUTE GROSS NEGLIGENCE OR AN INTENTIONAL WRONG; and

11.7.4  The parties hereto and each of them EXPRESSLY AGREES THAT IN THE EVENT OF ANY FINAL ADJUDICATION OR APPLICABLE ENACTMENT OF LAW THAT PUNITIVE, MULTIPLE AND/OR EXEMPLARY DAMAGES MAY NOT BE WAIVED, ANY RECOVERY BY ANY PARTY IN ANY FORUM SHALL NEVER EXCEED TWO (2) TIMES ACTUAL DAMAGES, except for an award of multiple damages to FRANCHISOR for willful trademark infringement, as provided by law.

11.7.5   ANY AND ALL CLAIMS AND ACTIONS ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATIONSHIP OF FRANCHISEE AND FRANCHISOR OR FRANCHISEE'S OPERATION OF THE UNIT, BROUGHT IN ANY FORUM BY ANY PARTY HERETO AGAINST THE OTHER, MUST BE COMMENCED WITHIN TWO (2) YEARS AFTER THE DISCOVERY OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION, OR SUCH CLAIM OR ACTION SHALL BE BARRED, EXCEPT FOR FINANCIAL OBLIGATIONS OF FRANCHISEE.

11.8    **No Class Actions.**  No party shall initiate or participate in any class action litigation claim against any other party bound hereby, except that FRANCHISEE may initiate or participate in any class action arbitration claim by franchisees of FRANCHISOR against FRANCHISOR limited exclusively to alleged misappropriation of moneys from the Fund of any System authorized by this Agreement, which claim must be brought only in arbitration under the provisions of this Section 11.

11.9    **Post-Term Applicability.**  The provisions of this Section 11 shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement, however effected.

## Miscellaneous Provisions.

12.0    **Relationship of the Parties.**  This Agreement does not constitute FRANCHISEE an agent, legal representative, joint venturer, partner, employee or servant of FRANCHISOR or its affiliated corporation for any purpose whatsoever; and it is deemed understood between the parties hereto that FRANCHISEE shall be an independent contractor and is in no way authorized to make any contract, agreement, warranty or representation on behalf of FRANCHISOR or its affiliated corporation or to create any obligation, express or implied, on behalf of FRANCHISOR or its affiliated corporation.  The parties agree that this Agreement does not create a fiduciary relationship between FRANCHISOR or its affiliated corporation and FRANCHISEE.

12.1    Under no circumstances shall FRANCHISOR or FRANCHISEE be liable for any act, omission, debt or other obligation of the other party.  Each party shall indemnify, protect, defend and save the other party harmless against any such claim.  The cost of defending against any claim arising directly or indirectly from, or as a result of, or in connection with FRANCHISEE's operation of the Unit shall be borne by FRANCHISEE.

13.0    **Non-Waiver.**  Any failure of FRANCHISOR to exercise any power reserved to it hereunder, or to insist upon strict compliance by FRANCHISEE with any term, covenant or condition in this Agreement, and any waiver by FRANCHISOR of any breach of a term, covenant or condition shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same or any other term, covenant or condition in this Agreement.  Subsequent acceptance by FRANCHISOR of the payments due to it hereunder, in whole or in part, shall not be deemed to be a waiver by FRANCHISOR of any preceding breach by FRANCHISEE of any term, covenant or condition of this Agreement.  FRANCHISOR may, in its sole discretion, waive or modify any obligation of other franchisees under agreements similar to this Agreement, and no such waiver or modification shall obligate FRANCHISOR to grant a similar waiver or modification to FRANCHISEE.  Acceptance by FRANCHISOR of payments due under this Agreement from any other person or entity shall be deemed to be acceptance from such person or entity as an agent of FRANCHISEE and not as recognition of such person or entity as an assignee of or successor to FRANCHISEE.

14.0    **Notices.**  All notices hereunder by FRANCHISOR to FRANCHISEE shall, at FRANCHISOR's option, be personally delivered or sent by telecopier, prepaid private courier or certified mail to the FRANCHISEE at the address set forth in Item "1" of the Contract Data Schedule of this Agreement or to such other address as FRANCHISEE may from

time to time give notice of to FRANCHISOR. If delivery is refused, proof of attempted delivery shall be deemed delivery. All notices hereunder by FRANCHISEE to FRANCHISOR shall be sent by certified mail to Allied Domecq Retailing USA, at Post Office Box 317, 14 Pacella Park Drive, Randolph, Massachusetts 02368, Attention: Senior Vice President and General Counsel or to such other address as FRANCHISOR may from time to time give notice to FRANCHISEE.

15.0    **Entire Agreement.** This Agreement, and the documents referred to herein shall be the entire, full and complete agreement between FRANCHISOR and FRANCHISEE concerning the subject matter hereof, and supersedes all prior agreements, no other representation having induced FRANCHISEE to execute this Agreement; and there are no representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied herein, which are of any force or effect with reference to this Agreement or otherwise. No amendment, change or variance from this Agreement shall be binding on either party unless executed in writing. Captions, paragraph designations and section or subsection headings are included in this Agreement for convenience only, and in no way define, limit, construe or describe the scope or intent of the respective parts of this Agreement. The Special Terms and Conditions attached to this Agreement supplement the General Terms and Conditions and are intended to be additional thereto. In the event of any conflict between any provisions thereof, the provisions of the Special Terms and Conditions shall be deemed to prevail.

16.0    **Severability.** Each section, part, term and provision of this Agreement shall be considered severable, and if, for any reason, any section, part, term or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation of a court or agency having valid jurisdiction, such shall not impair the operation or affect the remaining portions, sections, parts, terms or provisions of this Agreement, and the latter will continue to be given full force and effect and bind the parties hereto; and said invalid section, part, term or provision shall be deemed not to be a part of this Agreement.

17.0    **Applicable Law.** This Agreement shall be deemed to have been made in, and shall be interpreted, construed and governed by the laws of, the Commonwealth of Massachusetts. FRANCHISEE acknowledges that this Agreement is to be performed in part through services rendered to FRANCHISEE in Massachusetts.

18.0    **Independent Investigation.**   THE PROSPECT FOR SUCCESS OF THE BUSINESS VENTURE UNDERTAKEN BY FRANCHISEE BY VIRTUE OF THIS AGREEMENT IS SPECULATIVE AND DEPENDS TO A MATERIAL EXTENT UPON FRANCHISEE'S CAPABILITY AS AN INDEPENDENT BUSINESS PERSON AND FRANCHISEE, AS WELL AS OTHER FACTORS. FRANCHISOR MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE POTENTIAL SUCCESS OF THE BUSINESS VENTURE UNDERTAKEN BY FRANCHISEE HEREBY. FRANCHISEE REPRESENTS AND WARRANTS THAT IT HAS ENTERED INTO THIS AGREEMENT AFTER MAKING INDEPENDENT INVESTIGATIONS OF FRANCHISOR'S BUSINESS, AND NOT IN RELIANCE UPON ANY REPRESENTATION BY FRANCHISOR AS TO SALES OR PROFITS WHICH FRANCHISEE IN PARTICULAR MIGHT BE EXPECTED TO REALIZE. FRANCHISEE FURTHER REPRESENTS AND WARRANTS THAT FRANCHISOR AND ITS REPRESENTATIVES, EMPLOYEES OR AGENTS HAVE MADE NO REPRESENTATIONS TO INDUCE FRANCHISEE TO ACQUIRE THIS FRANCHISE AND EXECUTE THIS AGREEMENT WHICH ARE NOT EXPRESSLY SET FORTH HEREIN OR IN THE DISCLOSURE MATERIALS PROVIDED TO FRANCHISEE PRIOR TO ENTERING INTO THIS AGREEMENT.

19.0    **FRANCHISEE acknowledges receiving a copy of this Agreement, the attachments thereto, and agreements relating thereto, if any, at least five (5) business days prior to the date on which this Agreement was executed. FRANCHISEE further acknowledges receiving, on the date of the first personal meeting between FRANCHISOR and FRANCHISEE and not less than ten (10) business days prior to the date on which this Agreement was executed, the disclosure documents required by the Trade Regulation Rule of the Federal Trade Commission entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures".**

Initials



-19-

PC# 360455-Sterling Heights, MI

ALLIED DOMECQ-QSR
RIDER TO FRANCHISE AGREEMENT

**SCHEDULE "BR"**
110100

### SPECIAL TERMS AND CONDITIONS APPLICABLE TO A
### BASKIN-ROBBINS FRANCHISE

In connection with its business and the business of its Baskin-Robbins franchisees, BASKIN-ROBBINS has developed, used and continues to use and control the usage of certain proprietary interests, trademarks, logos, emblems and other indicia of origin, service marks and trade names, including, without limitation, *Baskin 31 Robbins®*, which is registered as a trademark on the Principal Register of the United States Patent and Trademark Office (the "Proprietary Marks"), to identify for the public the source of goods and services marketed thereunder and to represent to the public high and uniform standards of quality, cleanliness, appearance and service.

FRANCHISEE, being cognizant of the distinctive and valuable significance to the public of the Baskin-Robbins System and Proprietary Marks, desires to make use of the trademark *Baskin 31 Robbins®*, and to enjoy the benefits of that mark, the other Proprietary Marks and the Baskin-Robbins System. FRANCHISEE understands the importance of FRANCHISOR's high and uniform standards of quality, cleanliness, appearance and service to the value of the Baskin-Robbins System and the necessity of opening and operating FRANCHISEE's Baskin-Robbins Unit in conformity with the Baskin-Robbins System and in accordance with FRANCHISOR's Standards and specifications.

## DEFINITIONS

As used in these Special Terms and Conditions applicable to a Baskin-Robbins Franchise, the following defined terms shall have the following meanings:

A.   The "Baskin-Robbins Unit" is all or a portion of the Premises dedicated to the operation of the Baskin-Robbins System, as approved by FRANCHISOR.

B.   "Baskin-Robbins Products" mean and refer to ice cream, ice milk, sherbets, water ices, yogurts, frozen desserts, syrups, toppings, confections, novelties, food, beverages and fountain ingredients, all of a variety of kinds or flavors, made in accordance with the formulas or specifications designated by BASKIN-ROBBINS and identified by the Baskin-Robbins Proprietary Marks.

C.   "Associated BR Products" mean and refer to such other products and supplies as may be specified from time to time in writing by FRANCHISOR for sale in the Baskin-Robbins Unit.

### Section BR-1.  Grant Of The Franchise

1.0   BASKIN-ROBBINS grants to FRANCHISEE for and during the term hereof and FRANCHISEE accepts a Franchise to operate an ice cream and yogurt store utilizing the Baskin-Robbins System in accordance with the terms, covenants and conditions of this Agreement, at one location only, the Premises described in Item "A" of the Contract Data Schedule of this Agreement (hereinafter called the "Baskin-Robbins Unit").  In connection therewith, this Franchise includes the right to use at the Baskin-Robbins Unit only, the trademark *Baskin 31 Robbins®*, along with other Proprietary Marks owned by BRI and utilized by BASKIN-ROBBINS in connection with other Baskin-Robbins units, and the right to use at the Unit only, the Baskin-Robbins System including confidential and valuable information which now exists or may be acquired hereafter and set forth in FRANCHISOR's manuals or as otherwise from time to time disclosed to Baskin-Robbins franchisees.

### Section BR-2.  Scope Of The Franchise

2.0   This Baskin-Robbins Franchise is specific to one location only, for the term of this Agreement.  It grants no rights outside the Premises, nor includes any territorial protection against competition. FRANCHISOR reserves and retains the right to operate or permit others to operate Baskin-Robbins units or to sell or distribute Baskin-Robbins Products and/or services or to otherwise use the Baskin-Robbins Proprietary Marks and/or the Baskin-Robbins System, in each case at any other location. FRANCHISOR and other franchisees may compete for customers drawn from the same area as FRANCHISEE's Baskin-Robbins Unit using the same or different brand(s).

2.2.4   Baskin-Robbins Products will be supplied to FRANCHISEE by BASKIN-ROBBINS, or one or more suppliers approved by BASKIN-ROBBINS.

### Section BR-3.  Advertising and Promotion

3.0   FRANCHISOR shall prepare and coordinate a "Grand Opening" promotional advertising program (or such other advertising program as FRANCHISOR may specify) for the initial opening of the Baskin-Robbins Unit.

3.1   FRANCHISOR shall review for approval all proposed advertising and promotional materials prepared by FRANCHISEE for use in local advertising relating to the Baskin-Robbins Unit; and

3.3.1   FRANCHISOR shall administer The Baskin-Robbins Advertising and Sales Promotion Fund (the "Baskin-Robbins Fund") and shall oversee all Baskin-Robbins System and product marketing, advertising and promotion, with sole discretion to approve or disapprove the creative concepts, materials and media used in the same, and the placement and allocation thereof.  That portion of FRANCHISEE's payments

under paragraph 4.4 of this Agreement equal to one percent (1%) of the Gross Sales of the Baskin-Robbins Unit will be utilized, at the discretion of FRANCHISOR, to provide for the administrative expenses of the Baskin-Robbins Fund and for programs designed to increase sales and enhance and further develop the public reputation and image of BASKIN-ROBBINS and the Baskin-Robbins System. The balance, including any interest earned by the Baskin-Robbins Fund, will be used for advertising and related expenses. Contributions to the Baskin-Robbins Fund in excess of the percentage of Gross Sales of the Baskin-Robbins Unit set forth in Item "F" of the Contract Data Schedule shall be used in accordance with the programs to which they relate.

3.3.2   In addition to its other obligations under this Section BR-3, FRANCHISEE shall participate in all sales promotion programs as required from time to time by FRANCHISOR. Without limiting the foregoing, FRANCHISEE must redeem, for products, gift certificates distributed by FRANCHISOR, including, without limitation, unexpired gift certificates issued by any previous franchisee operating a Baskin-Robbins Unit at the Premises. FRANCHISEE will be reimbursed or credited for the cost of products by FRANCHISOR upon its receipt of redeemed gift certificates. However, FRANCHISEE may, at its discretion, redeem other coupons issued by FRANCHISOR for which FRANCHISEE is not reimbursed or credited. All coupons or other promotions in which FRANCHISEE participates shall bear the expiration date thereof.

3.3.3   FRANCHISOR may, from time to time in its sole discretion, initiate one or more mandatory Maximum Price Promotional Campaigns for products or services designated by FRANCHISOR. A material aspect of these campaigns will be FRANCHISOR's right to establish the maximum price that FRANCHISEE can charge customers for the designated product(s) or service(s) during the promotional period. FRANCHISEE agrees to participate in each such campaign and, for the duration of the promotional period, FRANCHISEE will charge customers no more than the maximum price established by FRANCHISOR for the designated product(s) and/or service(s). FRANCHISEE retains the right to charge customers less than any maximum retail price FRANCHISOR may establish.

## Section BR-4.  Payments

4.4   FRANCHISEE shall make payments to the Baskin-Robbins Fund as set forth in paragraph 4.4 of the General Terms and Conditions. FRANCHISOR reserves the right in its sole and absolute discretion to designate or change the composition of Baskin Robbins units included in the base for purposes of determining "two-thirds" support.

## Section BR-5.  Covenants of FRANCHISEE

5.0   FRANCHISEE understands and acknowledges that every detail of the Baskin-Robbins System is important to BASKIN-ROBBINS, to FRANCHISEE and to other Baskin-Robbins franchisees, in order to maintain high and uniform standards of quality, cleanliness, appearance, service, products and procedures and thereby increase the demand for Baskin-Robbins Products and protect and enhance the reputation and goodwill of BASKIN-ROBBINS.

5.1.4   FRANCHISOR or its designee shall not be liable to FRANCHISEE, or be deemed in breach or default of any obligation contained in this Agreement, for any delay or failure of delivery for any cause beyond its reasonable control, including, without limitation, difficulties of supply occasioned by war, law, weather conditions, acts of God, regulations or order of public authority, labor troubles or shortages of materials. If BASKIN-ROBBINS or its designee shall not be able to supply the full requirements of all Baskin-Robbins Units, FRANCHISOR or its designee shall endeavor to apportion available Baskin-Robbins Products and Associated BR Products equitably among them.

5.1.5.1   FRANCHISEE agrees to purchase from BASKIN-ROBBINS or its designee, and BASKIN-ROBBINS or its designee agrees to supply to FRANCHISEE, all of the Baskin-Robbins Unit's requirements for the Baskin-Robbins Products specified by FRANCHISOR from time to time in the Standards, at BASKIN-ROBBINS' or its designee's prices at the time of delivery. Such Baskin-Robbins Products will be of the variety of kinds and flavors which from time to time are selected by FRANCHISOR for supply to Baskin-Robbins franchisees. FRANCHISOR or its designee may change, at any time and from time to time without prior notice, its prices for the sale and delivery of any Baskin-Robbins Products.

5.1.5.2   FRANCHISEE agrees to place its orders with FRANCHISOR or its designee for Baskin-Robbins Products to be supplied by BASKIN-ROBBINS or its designee at such times and in such manner as from time to time prescribed by FRANCHISOR. FRANCHISOR or its designee agrees to deliver such orders to FRANCHISEE in accordance with regular route schedules and times of delivery established by FRANCHISOR or its designee from time to time, including during non-business hours of FRANCHISEE, in its sole discretion. FRANCHISEE agrees upon receipt of notice of the scheduled delivery time, to provide FRANCHISOR or its designee with a means of access to the Unit's frozen storage facility for the purpose of such delivery, by providing FRANCHISOR or its designee with a key to the Unit, or by having an agent present to open the Unit, or by other appropriate arrangements made with FRANCHISOR or its designee. FRANCHISEE will also provide adequate freezer and other storage space to permit delivery of Associated BR Products required by FRANCHISOR in connection with the Baskin-Robbins Franchise. FRANCHISEE acknowledges that late orders by FRANCHISEE cause additional administrative expenses to FRANCHISOR or its designee. FRANCHISEE agrees that FRANCHISOR or its designee may, in its discretion, refuse to process a late order or impose a reasonable late charge or additional delivery expense charge, and add such charge to the next invoice payable by FRANCHISEE.

5.1.5.3   FRANCHISEE agrees to pay for all Baskin-Robbins Products which it purchases from BASKIN-ROBBINS or its designee on such terms and conditions as BASKIN-ROBBINS or its designee may from time to time specify. Should FRANCHISEE fail to make timely payment, FRANCHISOR shall have the right, upon notice to FRANCHISEE, to require cash or cash equivalent on or in advance of delivery.

5.1.5.4   In the event of a default by FRANCHISEE in its payment obligations under this Agreement, or in payment of rent under the Lease, if applicable, FRANCHISOR or its designee shall have the right, in addition

*Baskin-Robbins Rider - pg 2*

to any other remedies, without notice, to discontinue the sale or delivery of any Baskin-Robbins Products to the Unit and to any other Baskin-Robbins unit in which FRANCHISEE or any of its shareholders, members or partners has an interest, until the next regularly scheduled delivery date following the date on which FRANCHISOR or its designee has received payment in full of all of FRANCHISEE's outstanding invoices for Baskin-Robbins Products, rent and any other payment(s) due under this Agreement or the Lease, if applicable.

5.1.5.5   FRANCHISEE acknowledges and agrees that BASKIN-ROBBINS or its designee has the exclusive right to supply FRANCHISEE Baskin-Robbins Products.

5.1.5.6   FRANCHISEE shall purchase all Associated BR Products used or offered for sale by the Baskin-Robbins Unit solely from suppliers, manufacturers, distributors, and other sources who are currently approved by FRANCHISOR.

## Section BR-7.  Proprietary Marks

7.0      BASKIN-ROBBINS is a wholly-owned subsidiary of Baskin-Robbins Incorporated, a Delaware corporation ("BRI").   BASKIN-ROBBINS has been licensed by BRI to use the Proprietary Marks in conjunction with the granting of franchises for the operation of Baskin-Robbins units on terms and conditions which have been approved by BRI.  If FRANCHISOR's license from BRI shall expire or for any reason be terminated, BRI or its nominee shall succeed to all of the rights and assume all of the duties of FRANCHISOR under this Agreement.

7.0.1    FRANCHISEE acknowledges and agrees that *Baskin 31 Robbins*® is a registered trademark owned by BRI, that said mark has been and is being used by BASKIN-ROBBINS under license from BRI, and by other franchisees and licensees of BASKIN-ROBBINS; that said mark, together with the other Proprietary Marks presently owned by BRI and/or BASKIN-ROBBINS or which may be acquired in the future by either of them, constitute part of the Baskin-Robbins System; that valuable goodwill is associated with and attached to said mark and the other Baskin-Robbins Proprietary Marks; and that any and all goodwill associated with the Baskin-Robbins Proprietary Marks, including any goodwill which might be deemed to have arisen through FRANCHISEE's activities, inures directly and exclusively to the benefit of BRI.

7.5      FRANCHISEE shall operate, advertise, and promote the Baskin-Robbins Unit under the name "Baskin-Robbins," with no accompanying words or symbols of any nature except as may be otherwise required by law or designated by FRANCHISOR.  FRANCHISEE shall not use, as part of its corporate or other business name, any Proprietary Marks used by FRANCHISOR, including, but not limited to, "Baskin-Robbins", "Baskin" or "Robbins", or any form or variations thereof, including, but not limited to, "B.R.," which, in the judgment of FRANCHISOR, is likely to cause third parties to be confused or mistaken with respect to the separate identities of BASKIN-ROBBINS and FRANCHISEE.

7.6      BASKIN-ROBBINS represents that Baskin-Robbins Incorporated ("BRI") is the sole owner of all right, title and interest in and to the Baskin-Robbins Proprietary Marks and that BASKIN-ROBBINS is licensed by BRI to grant a Franchise to FRANCHISEE and to license the use of the Baskin-Robbins Proprietary Marks upon the terms and conditions of this Agreement.

## Section BR-9.  Default

9.4   <u>Termination</u> - Upon any termination or expiration of this Agreement:

9.4.6.1  FRANCHISEE shall further and immediately sell to FRANCHISOR (who hereby agrees to purchase) all of FRANCHISEE's unopened and unexpired Baskin-Robbins Products and such unopened and unexpired Associated BR Products as bear any of the Proprietary Marks, at FRANCHISEE's purchase cost.

Initials:

J. M.

ALLIED DOMECQ QSR
RIDER TO FRANCHISE AGREEMENT

PC# 360455-Sterling Heights, MI
**SCHEDULE "BR"**
ADDENDUM ONE
110199

**SPECIAL TERMS AND CONDITIONS APPLICABLE TO**
**A BASKIN-ROBBINS FRANCHISE**

## PROVISIONS APPLICABLE TO A SINGLE-BRAND BASKIN-ROBBINS UNIT

1.0.1     The first five words of paragraph 1.0.1 of the General Terms and Conditions are changed from *"FRANCHISEE and its Designated Representative"* to *"FRANCHISEE or its Designated Representative"*. FRANCHISEE must attend such training for the first unit owned by FRANCHISEE; training for each subsequent unit may be attended by a Designated Representative.

5.1.8     Paragraph 5.1.8 of the General Terms and Conditions is deleted from the Agreement in its entirety and replaced with the following:

"The Unit shall at all times be managed by at least one individual who has successfully completed FRANCHISOR's training program. Such person must have literacy and fluency in the English language sufficient, in the good faith opinion of FRANCHISOR, to satisfactorily complete FRANCHISOR's training program and to communicate with employees, customers, and suppliers. If FRANCHISEE operates more than one unit, FRANCHISOR requires that each additional unit be managed by a Designated Representative approved by FRANCHISOR."

Initials:

J. M.

Baskin-Robbins Rider - Addendum One

ALLIED DOMECQ QSR                                                    PC360465/BR# 893
082400
RIDER TO FRANCHISE AGREEMENT

**ADDITIONAL TERMS AND CONDITIONS APPLICABLE TO
A BASKIN-ROBBINS FRANCHISE PURSUANT TO
THE BASKIN-ROBBINS FRANCHISE ROYALTY CONVERSION OFFER**

Notwithstanding anything to the contrary contained in the Franchise Agreement's General Terms and Conditions, Special Terms and Conditions or other schedule relating thereto, the following terms and conditions are hereby incorporated into the Franchise Agreement, consistent with the terms of the Baskin-Robbins Franchise Royalty Conversion Offer (the "Offer") previously executed by FRANCHISOR and FRANCHISEE, or FRANCHISEE's predecessor in interest.

1.      Wholesale Pricing Mechanism: Exhibit II to the Offer, entitled "Wholesale Pricing Mechanism", is attached hereto as Exhibit A and is hereby incorporated into the Franchise Agreement as if the text were set forth fully herein.

2.      Incentive Payments: FRANCHISEE  is entitled to receive the incentive payments of $636.00 on December 1st for the years 2001 through 2004, as set forth in the Offer.

3.      Retail Information System: After the word "install" on line 5 of paragraph 5.2.6 of the General Terms and Conditions, the following is inserted: "(and exclusively use)". In addition, after the word "FRANCHISOR" in subsection (d) of paragraph 5.2.6.1 of the General Terms and Conditions, the following is inserted: "(but replacement will not be required sooner than three (3) years after FRANCHISEE initially installs RIS)".

4.      Late Fees, Interests and Costs: The words "or rejected EFT" are hereby inserted after the words "dishonored checks" on line 8 of paragraph 4.7 of the General Terms and Conditions, and the sentence immediately afterward is deleted in its entirety and replaced with the following: "Within five (5) days after FRANCHISOR's demand, FRANCHISEE must replace dishonored checks and/or rejected EFT with a bank certified or cashiers check in the aggregate amount owed, plus interest, late fees, collection fees, costs of collection and attorneys fees."

5.      Lease Option Agreement: If the real estate is owned by FRANCHISEE or leased by FRANCHISEE from a third-party, you must provide FRANCHISOR, concurrently with the execution of the Franchise Agreement, FRANCHISOR's standard form Lease Option Agreement covering the full term of the Franchise Agreement. In FRANCHISOR's sole discretion, FRANCHISOR may waive this requirement if FRANCHISOR determines that a Lease Option Agreement is unobtainable.

6. Effect of the Offer: FRANCHISEE already has received a written "Notice to Commence" pursuant to the Offer, and FRANCHISEE shall perform all ongoing obligations under the Offer in accordance with the Offer. It is the intent of this addendum to incorporate and/or include those provisions of the Offer that are not a part of the General Terms and Conditions or of existing Special Terms and Conditions, schedules or attachments. Accordingly, in the event of a conflict between the rights and obligations of the Offer and the terms of this Franchise Agreement (of which all schedules, attachments and this addendum form a part), the terms of the Offer shall prevail.

Initials:

IN WITNESS WHEREOF the parties hereto, intending to be legally bound hereby, have duly executed, sealed and delivered this agreement in triplicate, as of the date and year first written above. FRANCHISEE hereby acknowledges receipt of this Franchise Agreement, together with any amendments, at least five (5) business days prior to the date hereof.  FRANCHISEE further acknowledges having carefully read this agreement in its entirety, including all Schedules identified above and the Personal Guaranty below (if applicable).

FRANCHISOR

ATTEST:

_____
Wendy Deas, Assistant Secretary

BASKIN-ROBBINS USA, CO.

By: _____
Bryan Stolte, Director of Retail Operations

This agreement is not binding upon the above corporation(s) until executed and attested by an authorized officer.

**FRANCHISEE ACKNOWLEDGES SECTION 11 OF THE GENERAL TERMS & CONDITIONS OF THIS CONTRACT, WHICH PROVIDES FOR FRANCHISEE'S EXPRESS WAIVER OF RIGHTS TO A JURY TRIAL, TO PARTICIPATE IN CLASS ACTION LAWSUITS, TO OBTAIN PUNITIVE, MULTIPLE OR EXEMPLARY DAMAGES, AND TO BRING ANY CLAIM OR ACTION LATER THAN TWO YEARS AFTER THE DISCOVERY OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION.**

INITIAL

FRANCHISEE

WITNESS,

_____
Witness

JMM INVESTMENT, INC.

Entity

By: _____
Jovica M. Micic, President

## PERSONAL GUARANTEE BY SHAREHOLDERS OF A CORPORATION OR MEMBERS OF A LIMITED LIABILITY COMPANY

We, the undersigned, represent and warrant that we constitute  *[check whichever statement applies]*

[✓]  the shareholders of one hundred percent (100%) of the originally issued and outstanding capital stock of the above FRANCHISEE, a corporation

[  ]  one hundred percent (100%) of the members of the above FRANCHISEE limited liability company ("LLC")

organized under the laws of the state of Michigan.  Waiving demand and notice, the undersigned hereby, jointly and severally, personally guarantee the full payment of FRANCHISEE's money obligations under Section 4 and the performance of all of FRANCHISEE's other obligations under this Franchise Agreement, including, without limitation, paragraph 6.3 and Section 8, in its entirety relative to the restrictions on the activities of FRANCHISEE. We personally agree that the Franchise Agreement shall be binding upon each of us personally.   The undersigned, jointly and severally, agree that FRANCHISOR may, without notice to or consent of the undersigned, (a) extend, in whole or in part, the time for payment of FRANCHISEE's money obligations under paragraph 4; (b) modify, with the consent of FRANCHISEE, its money or other obligations hereunder; and/or (c) settle, waive or compromise any claim of FRANCHISOR against FRANCHISEE or any of the undersigned, all without in any way affecting the personal guarantee of the undersigned.  This Guarantee is intended to take effect as a sealed instrument.

_____
witness

_____
Jovica M. Micic, individually

PC# 360455
Sterling Heights, MI

## CERTIFICATION OF FRANCHISEE

As a material inducement for FRANCHISOR to grant FRANCHISEE this Franchise, the undersigned, including all individuals who influenced the FRANCHISEE's decision to enter into this agreement, hereby disclose to FRANCHISOR any and all promises, representations, agreements and/or understandings that are not expressly contained in the Franchise Agreement or the Offering Circulars, but which induced FRANCHISEE to sign this agreement or influenced FRANCHISEE's decision to sign this agreement:

DESCRIBE BELOW ALL PROMISES, UNDERSTANDINGS AND/OR AGREEMENTS THAT ARE NOT EXPRESSLY CONTAINED IN THE FRANCHISE AGREEMENT, BUT WHICH INFLUENCED YOUR DECISION TO BECOME FRANCHISEE.

*If there are none, you must write "NONE."*

NONE

DESCRIBE BELOW ALL REPRESENTATIONS OR STATEMENTS THAT ARE NOT EXPRESSLY CONTAINED IN THE FRANCHISE AGREEMENT OR THE OFFERING CIRCULARS BUT WHICH INFLUENCED YOUR DECISION TO BECOME FRANCHISEE.

*If there are none, you must write "NONE."*

NONE

*If you need more space to answer either query, attach and sign additional pages.*

THE UNDERSIGNED HEREBY CERTIFY THAT THE INFORMATION PROVIDED ABOVE IS TRUE, and this certification was executed only after obtaining the advice of an attorney.

Dated this ___14th___ day of ___NOVEMBER___, 20 _01_

Witness:                                                      JMM INVESTMENT, INC.

_____                     By: _____
Witness                                                            Jovica M. Micic, President & Individually

BRCOTERM
10/98

PC # 360455, Sterling Heights, MI
Baskin-Robbins Retail Unit No. 893

## TERMINATION OF FRANCHISE AGREEMENT AND GENERAL RELEASE

THIS AGREEMENT made this _14 ᵗʰ_ day of _NOVEMBER_ , 2001, by and between **BASKIN-ROBBINS USA, CO.**, a California corporation with principal offices in Randolph, Massachusetts (hereinafter "BASKIN-ROBBINS") and **SCOOPS-R-US, INC.**, a Michigan "S" corporation and **Barbara A. Tosetti and Bernard Tosetti** (collectively hereinafter referred to as the "UNDERSIGNED").

### RECITALS

This Agreement terminates the Franchise Agreement dated **March 23, 2001**, between BASKIN-ROBBINS USA, CO. and the UNDERSIGNED (hereinafter the "Franchise Agreement"), relating to the Baskin-Robbins Retail Unit at **35262 Dodge Park Road, Sterling Heights, MI 48312** (the "Premises"). This Agreement also provides for a release by the UNDERSIGNED of BASKIN-ROBBINS.

**NOW, THEREFORE,** in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree to the following:

### AGREEMENT

1. The Franchise Agreement is hereby terminated effective the date hereof provided, however, that the UNDERSIGNED shall continue to be bound by the restrictions and covenants set forth in the provisions of Paragraph 8 of the Franchise Agreement.

2. Effective the date hereof, the UNDERSIGNED'S Franchise Royalty Conversion Offer shall be assigned to the buyer of the Premises, and the UNDERSIGNED shall not be entitled to receive future annual incentive payments of $636.00 through December 1ˢᵗ of 2004 as described in said offer.

3. The UNDERSIGNED does hereby release, remise and forever discharge BASKIN-ROBBINS, its predecessors, successors and assigns, parent, subsidiaries and affiliated corporations, officers, directors, agents, employees and representatives, past and present, of any and all of such corporations of and from any and all claims, demands, causes of action, suits, debts, dues, duties, sums of money, accounts, reckonings, covenants, contracts (including any Franchise Agreement, Lease and Sublease), agreements, promises, damages, judgments, extents, executions, liabilities and obligations, both contingent and fixed, known and unknown, of every kind and nature whatsoever in law or equity, or otherwise, under local, state, or federal law, against any of them, which the UNDERSIGNED or any one of them or their predecessors in interest, if any, ever had, now have, or which they, their heirs, executors, administrators, successors, or assigns hereafter can, shall, or may have, for, upon, or by reason of, any matter, cause, or thing whatsoever, from the beginning of the world to the date of these presents.

4. Without limiting the generality of the foregoing, but by way of example only, the foregoing release shall apply to any and all state or federal antitrust claims or causes of action; state or federal securities law claims or causes of action; state or federal RICO claims or causes of action; breach of contract claims or causes of action; claims or causes of action based on misrepresentation or fraud; breach of fiduciary duty; unfair trade practices (state or federal); and all other claims and causes of action whatsoever.

5. The UNDERSIGNED (and each of them) further agree for themselves and for their successors and assigns, to indemnify and hold harmless forever, BASKIN-ROBBINS, its predecessors, successors and assigns, parent, subsidiary and affiliated corporations, officers, directors, agents, employees and representatives, past and present, against any and all claims or actions which hereafter may be brought or instituted against any or all of them, or their successors and assigns, by or on behalf of anyone claiming under rights derived from the UNDERSIGNED, or any of them, and arising out of or incidental to the matters to which this release applies.

6. Any individual who signs this release in a representative capacity for the UNDERSIGNED hereby represents and warrants that he or she is duly authorized by action of the Board of Directors of the UNDERSIGNED corporation to execute this release on its behalf.

7.  With respect to the matters hereinabove released, the UNDERSIGNED knowingly waive all rights and protection, if any, under Section 1542 of the Civil Code of the State of California, or any similar law of any state or territory of the United States of America.  Section 1542 provides as follows:

> "1542 General Release; Extent.  A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

**IN WITNESS WHEREOF**, THE PARTIES HERETO HAVE HEREUNDER SET THEIR HANDS AND SEALS THE DAY AND YEAR FIRST ABOVE WRITTEN.

(BASKIN-ROBBINS)

ATTEST:

**BASKIN-ROBBINS USA, CO.,**
a California corporation

By: _____

Wendy Deas, Assistant Secretary

Bryan Stolte, Director of Retail Ops.

(UNDERSIGNED)

WITNESS:

**SCOOPS-R-US, INC.**

_____
Witness

By: _____
Barbara Tosetti, President

WITNESS:

_____
witness

Barbara Tosetti, individually

_____
witness

Bernard Tosetti, individually

PC # 360455, Sterling Heights, MI
Baskin-Robbins Retail Unit No. 893

## CONDITIONAL OPTION TO RE-ENTER

THIS AGREEMENT made this _14TH_ day of _NOVEMBER_, 2001, by and between **BASKIN-ROBBINS USA, CO.**, a California corporation with principal offices in Randolph, Massachusetts (hereinafter "BASKIN-ROBBINS") and **SCOOPS-R-US, INC.**, a Michigan "S" corporation and **Barbara A. Tosetti and Bernard Tosetti** (collectively hereinafter referred to as "SELLER") and **JMM INVESTMENT, INC.** a Michigan corporation and **Jovica M. Micic** (collectively hereinafter referred to as "BUYER").

### RECITALS

WHEREAS, SELLER has sold to BUYER, pursuant to a Purchase and Sale Agreement dated **June 4, 2001** either all the outstanding capital stock of SELLER or substantially all the assets, equipment, supplies, leasehold improvements and other tangible property of SELLER relating to a Baskin-Robbins Retail Unit at **35262 Dodge Park, Sterling Heights, MI** (hereinafter referred to as the "BASKIN-ROBBINS RETAIL UNIT"),

WHEREAS, BASKIN-ROBBINS has granted BUYER a Franchise Agreement to operate the BASKIN-ROBBINS RETAIL UNIT; and

WHEREAS, SELLER is providing purchase money financing to BUYER and has requested the right, for and during the original, unextended term of SELLER's purchase money financing agreement, to re-enter the BASKIN-ROBBINS RETAIL UNIT upon default by BUYER under the purchase money agreement with SELLER.

NOW, THEREFORE, in consideration of the mutual promises herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.      BASKIN-ROBBINS grants SELLER a conditional option to re-enter and operate the BASKIN-ROBBINS RETAIL UNIT upon default by BUYER under the purchase money financing agreement, for and during the lesser of (i) the original term of the purchase money financing agreement or (ii) the balance of the term of the Franchise Agreement.  Such option is exercisable only by compliance with **paragraph 7 below**.  Re-entry must occur no later than thirty (30) days after SELLER gives written notice to BASKIN-ROBBINS of BUYER's default, unless BASKIN-ROBBINS permits additional time, in writing.  The foregoing option is granted upon the following conditions and re-entry shall not occur unless each of the following conditions shall have been satisfied in full by SELLER:

1.0.1     SELLER shall cure all monetary and non-monetary defaults of BUYER under all agreements with BASKIN-ROBBINS, including, without limitation, the Franchise Agreement and (if applicable) Sublease, without set-off or offset of any kind or nature, including, but not limited to, franchise fees, advertising fees, rent, tax escrow, percentage rent, collection fees, legal fees, interest, promissory note payments, equipment agreement payments and any and all other sums whatsoever owed to BASKIN-ROBBINS;

1.0.2     SELLER shall cure all violations, including, without limitation, standards, maintenance and contractual violations, at the BASKIN-ROBBINS RETAIL UNIT, no later than the date of re-entry.  However, if any violation by its nature cannot be cured prior to re-entry, SELLER shall be deemed to have complied with this condition if SELLER pays into escrow with BASKIN-ROBBINS funds sufficient, in BASKIN-ROBBINS' judgment, to cure the violations within a period of time and in a manner satisfactory to BASKIN-ROBBINS;

1.0.3     SELLER shall be solely responsible to lawfully obtain from BUYER all right and title to and possession of the BASKIN-ROBBINS RETAIL UNIT premises and all personal property situated therein.  BASKIN-ROBBINS shall have a concurrent right, but not an obligation, to obtain such possession.  SELLER shall reimburse BASKIN-ROBBINS for all costs and expenses (including reasonable attorneys fees) incurred in obtaining possession of the premises or personal property for SELLER;

1.0.4     SELLER shall satisfy all then-current conditions and requirements for qualification as a Baskin-Robbins franchisee, including, without limitation, compliance with then-current staffing and training requirements, including attendance at Baskin-Robbins Training Center prior to re-entry;

1.0.5     SELLER shall execute a new franchise agreement in the form current at the time of re-entry, and an assumption of the lessee's rights and obligations under the Sublease (if applicable), both for a term described in **paragraph 3 below**; and

1.0.6     SELLER shall assume any and all debts and obligations of BUYER, incurred in connection with any and all agreements with BASKIN-ROBBINS, any of its subsidiary corporations, or any third party to whom BASKIN-ROBBINS has guaranteed the obligations of BUYER (if any), including, without limitation, the Franchise Agreement and (if applicable) Sublease.

2.      BASKIN-ROBBINS has the right, but not the obligation, to cure any defaults of BUYER under its purchase money financing agreement(s) with SELLER (hereinafter the "Financing"), upon the original terms and conditions of said Financing, without acceleration of obligations, penalties, interest or additional obligations of any kind.  In connection with such cure, BASKIN-ROBBINS may, at its sole option, pay off the full outstanding unpaid principal balance of the Financing, in which event, SELLER will assign to BASKIN-ROBBINS all of its right, title and interest in the Financing.  If BASKIN-ROBBINS cures such defaults and/or assumes the rights of SELLER or the obligations of BUYER under the Financing, the conditional option to re-enter granted to SELLER hereunder shall extinguish and be of no further force and effect.  BASKIN-ROBBINS shall have the right to recover from BUYER all principal, interest, costs of collection, attorneys fees and other reasonable sums that BASKIN-ROBBINS pays to cure BUYER's default(s) under the Financing.

3.  If SELLER shall timely perform all of the preceding terms and conditions, and if BASKIN-ROBBINS does not elect to exercise the rights granted to it in **paragraph 2** above, SELLER shall have the right to re-enter and operate the BASKIN-ROBBINS RETAIL UNIT for the term commencing with the date of re-entry and ending **one hundred twenty (120) days** following the date of re-entry. SELLER's re-entry shall be for the sole purpose of enabling SELLER to resell the BASKIN-ROBBINS RETAIL UNIT to a new Buyer approved by BASKIN-ROBBINS. If SELLER re-enters the BASKIN-ROBBINS RETAIL UNIT and fails to conclude a transfer thereof within such period, SELLER's rights under the re-entry franchise agreement and (if applicable) Sublease shall terminate without notice or demand by BASKIN-ROBBINS, and following expiration of such period SELLER shall promptly vacate the premises, remove SELLER's personal property therefrom, and peaceably surrender possession of the premises to BASKIN-ROBBINS.

4.  Nothing herein shall create an obligation of BASKIN-ROBBINS to provide notice to SELLER of the status or performance of BUYER under BUYER's various agreements with BASKIN-ROBBINS. Nothing herein shall obligate BASKIN-ROBBINS to terminate BUYER's rights under any of BUYER's various agreements with BASKIN-ROBBINS or to take any action to limit SELLER's obligations hereunder. Nothing herein shall prevent or limit BASKIN-ROBBINS and BUYER from amending the Franchise Agreement and/or (if applicable) the Sublease or from entering into such other agreements regarding the BASKIN-ROBBINS RETAIL UNIT as BASKIN-ROBBINS and BUYER may desire.

5.  SELLER hereby agrees that any security interest, lien, claim or right now or hereafter asserted by SELLER, or the cash or non-cash proceeds thereof, shall be subject, junior and subordinate to any security interest, lien, claim or right with respect to the BASKIN-ROBBINS RETAIL UNIT, including but not limited to, all real and personal property and the proceeds thereof, now or hereafter asserted by BASKIN-ROBBINS, any third party to whom BASKIN-ROBBINS has guaranteed the obligations of BUYER (if any), or their respective successors or assigns.

6.  This conditional option to re-enter and all rights granted hereunder to SELLER shall extinguish and be of no further force and effect upon the payment in full to SELLER under the purchase money financing agreement with BUYER.

7.  All notices hereunder shall be in writing by certified mail. Notices to BASKIN-ROBBINS shall be to Allied Domecq QSR at P.O. Box 317, Randolph, Massachusetts, Attention Senior Vice President-Operations. Notices to Buyer and Seller shall be to _c/o Micic  18260000 Heber, Macomb, MI 48044_ and _c/o Tosetti  136 N. Brigham Drive, Sterling Hth MI 48312_ respectively.

IN WITNESS WHEREOF, THE SAID PARTIES HERETO HAVE HEREUNDER SET THEIR HANDS AND SEALS ON THE DAY AND YEAR FIRST ABOVE WRITTEN.

(SELLER)

WITNESS:                                     SCOOPS-R-US, INC.

_____      By:_____
Witness                                        Barbara A. Tosetti, President & Individually

_____      _____
Witness                                        Bernard Tosetti, individually

(BUYER)

WITNESS:                                     JMM INVESTMENT, INC.

_____      By:_____
Witness                                        Jovica M. Micic, President & Individually

(BASKIN-ROBBINS)

ATTEST:                                    BASKIN-ROBBINS USA, CO.

_____      By:_____
Wendy Deas, Assistant Secretary                       Bryan Stolfe, Director of Retail Operations

THIS AGREEMENT IS NOT BINDING ON BASKIN-ROBBINS UNTIL EXECUTED AND ATTESTED BY ITS AUTHORIZED REPRESENTATIVES

BRENTRY12/98

P/C# 360455

## CERTIFICATE OF CORPORATE RESOLUTION
## AND CERTIFICATE OF INCUMBENCY
## ALLIED DOMECQ QSR

**Corporate Name:**

### JMM INVESTMENT, INC.

The undersigned hereby certifies that he/she is the duly elected and acting president of the above named corporation and keeper of the official records and corporate seal of said corporation, and that the following is a true and correct copy of the resolutions adopted by the Board of Directors of said corporation at a meeting duly held on the _____ *14th* _____ day of _____ *November* _____, 2001 at which meeting a quorum was present and acting throughout and that such resolutions have not been rescinded or modified and are now in full force and effect:

"RESOLVED, that this corporation enter into the following agreement or agreements with Baskin-Robbins USA, Co. and/or affiliates or subsidiaries thereof:

_____ Franchise Agreement _____

_____ Conditional Option to Re-Enter _____

_____ Waiver and Release _____

"FURTHER RESOLVED, that any one of the officers of the corporation is authorized and directed to execute said agreements on behalf of this corporation, and to approve any modifications, extensions, amendments or terminations of said agreements as any said officer may deem to be in the best interests of the corporation, notwithstanding the fact that such documents as amended, modified, terminated or extended may differ from those presented at this meeting."

I further certify that there is no provision in the Charter or By-Laws of said corporation limiting the power of the Board of Directors to adopt the foregoing resolutions, and that the same are in conformity with the provisions of said Charter and By-Laws.

I further certify that the following are the names and official signatures of the present officers of the said corporation:

Print or Type Name                                          Signature of Officer

Jovica M. Micic_____ President         *Jovica M. Micic*

_____ Vice President         _____

_____ Secretary              _____

_____ Treasurer              _____

Allied Domecq QSR and its subsidiary corporations are EOE and AA Employers
(Franchisees are not employees)

ADQSRCERTCORP
05/00

PC # 360455
Sterling Heights, MI

# GENERAL RELEASE

THIS GENERAL RELEASE is made this _14 TH_ day of _NOVEMBER_, 2001.

WITNESSETH:

Barbara A. Tosetti and Bernard Tosetti, residents in the State of Michigan, and SCOOPS-R-US, a Michigan "S:" corporation having its principal place of business at 35262 Dodge Park, Sterling Heights, Michigan (each of the foregoing being collectively referred to herein as the "UNDERSIGNED") for and in consideration of the sum of One Dollar ($1.00) paid to them by BASKIN-ROBBINS USA, CO., and other good and valuable consideration, the receipt of which is hereby acknowledged, the UNDERSIGNED, individually and for itself, its parent, affiliates, agents, servants, employees, shareholders, subsidiaries, officers, directors, partners, heirs, successors and assigns, do each hereby forever release, remise and discharge BASKIN-ROBBINS USA, CO., its predecessors, successors and assigns, parent, subsidiaries and affiliated corporations, officers, directors, agents, employees and representatives, past and present, of any and all of such corporations (all collectively referred to herein as "BASKIN-ROBBINS"), of and from any and all claims, demands, causes of action, suits, debts, dues, duties, sums of money, accounts, reckonings, covenants, contracts, agreements, promises, damages, judgments, extents, executions, liabilities and obligations, both contingent and fixed, known and unknown, of every kind and nature whatsoever in law or equity, or otherwise, under local, state, or federal law, against any of them, which the UNDERSIGNED or any one of them or their predecessors in interest, if any, ever had, now have, or which they, their heirs, executors, administrators, successors, or assigns hereafter can, shall, or may have, for, upon, or by reason of, any matter, cause, or thing whatsoever, from the beginning of the world to the date of these presents.

Without limiting the generality of the foregoing, but by way of example only, the foregoing release shall apply to any and all state or federal antitrust claims or causes of action; state or federal securities law claims or causes of action; state or federal RICO claims or causes of action; breach of contract claims or causes of action; claims or causes of action based on misrepresentation or fraud; breach of fiduciary duty; unfair trade practices (state or federal); and all other claims and causes of action whatsoever.

The UNDERSIGNED (and each of them) further agree for themselves and for their successors and assigns, to indemnify and hold harmless forever, BASKIN-ROBBINS, its predecessors, successors and assigns, parent, subsidiary and affiliated corporations, officers, directors, agents, employees and representatives, past and present, against any and all claims or actions which hereafter may be brought or instituted against any or all of them, or their successors and assigns, by or on behalf of anyone claiming under rights derived from the UNDERSIGNED, or any of them, and arising out of or incidental to the matters to which this release applies.

The UNDERSIGNED and BASKIN-ROBBINS agree that this release is not intended nor shall it be construed as an admission of any wrongdoing or liability and that it shall not be admissible in evidence in any suit or proceeding whatsoever as evidence or admission of any liability.

Any individual who signs this release in a representative capacity for the UNDERSIGNED corporation hereby represents and warrants that he or she is duly authorized by action of the Board of Directors of the UNDERSIGNED corporation to execute this release on its behalf.

With respect to the matters hereinabove released, the UNDERSIGNED knowingly waive all rights and protection, if any, under Section 1542 of the Civil Code of the State of California, or any similar law of any state or territory of the United States of America. Section 1542 provides as follows:

> "1542 General Release; Extent. A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which, if known by him, must have materially affected his settlement with the debtor."

IN WITNESS WHEREOF, the UNDERSIGNED executed this General Release on the day and year first above written.

_____ _Dragolieb Micic_ _____       _Barbara A. Tosetti_ _____
Witness to all signatories            Barbara A. Tosetti, individually

_____ `"` _____       _Bernard Tosetti_ _____
           Bernard Tosetti, individually

WITNESS:            SCOOPS-R-US

_____ _Dragolieb Micic_ _____       By: _Barbara A. Tosetti_ _____
Witness               Barbara A. Tosetti, President

BRGENREL-12/98

JS 44 (04)

# CIVIL COVER SHEET 26099

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
BASKIN-ROBBINS USA, CO.

## DEFENDANTS
JMM INVESTMENT, INC. and JOVICA M. MICIC

**(b)** County of Residence of First Listed Plaintiff    Massachusetts
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    Macomb
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Elizabeth C. Jolliffe (P42712)
Clark Hill PLC, 500 Woodward Avenue, #3500, Detroit, MI 48226

Attorneys (If Known)    26099

## II. BASIS OF JURISDICTION (Select One Box Only)

- ☐ 1   U.S. Government Plaintiff
- ☑ 3   Federal Question (U.S. Government Not a Party)
- ☐ 2   U.S. Government Defendant
- ☐ 4   Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Select One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☑ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☑ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Select One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☑ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Select One Box Only)

- ☑ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
25 U.S.C. 1114

Brief description of cause:
Trademark violation and breach of contract

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☑ No

## VIII. RELATED CASE(S) IF ANY
(See instructions)
JUDGE      DOCKET NUMBER

DATE
January 19, 2006

SIGNATURE OF ATTORNEY OF RECORD
*Elizabeth C. Jolliffe (ud)*

FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

RSUANT TO LOCAL RULE 83.11

1.          Is this a case that has been previously dismissed?          ☐ Yes  ☑ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

2.          Other than stated above, are there any pending or previously
            discontinued or dismissed companion cases in this or any other
            court, including state court? (Companion cases are matters in which
            it appears substantially similar evidence will be offered or the same
            or related parties are present and the cases arise out of the same
            transaction or occurrence.)          ☐ Yes  ☑ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

Notes :